# 裁 决 书



青 岛 仲 裁 委 员 会

# Qingdao Arbitration Commission
# ARBITRAL AWARD

QINGZHONGCAIZI [2015] No. 307

**Between**

**RIZHAO J&J MANUFACTURING CO., LTD.**

**Claimant**

- and-

**NEW ENGLAND OUTDOOR &
RECREATIONAL PRODUCTS, LLC.**
Respondent

Date: 31 May 2019

# Qingdao Arbitration Commission ARBITRAL AWARD

**QINGZHONGCAIZI[2015] No. 307**

**Claimant (Respondent in counterclaim):** Rizhao J&J Manufacturing Co., Ltd. Certificate for Uniform Social Credit Code 91371102734724091C, residing at Xincun, Street Committee, Rizhao, original legal representative: Zhang Yan, present legal representative: Zhao Wei, position: general manager.

**Arbitration Representative:**

Hao Zhigang, Liu Zongxiang, Shanghai Allbright (Qingdao) Law Firm

**Respondent (Claimant in counterclaim):** New England Outdoor & Recreational Products, LLC., residing at 13 Wood St. West Haven, CT 06516, USA, Legal Representative: Tracy Forlini, Position: member of Board

**Arbitration representative:**

Zhang Meiping, Shandong Deheng Law Firm

Li Qinghua, Shandong Deheng (Jinan) Law Firm

Qingdao Arbitration Commission (hereinafter as "the Commission") accepted the arbitration case on May 18, 2015 according to the arbitration clause in the Distribution Contract signed by the Claimant and the Respondent on January 20, 2010 and the Application for Arbitration submitted by the Claimant.

The arbitration proceeding of the case has been finished. The Tribunal hereby issues this award which includes the procedure of the case, the arbitration claim, counterclaim and defense, evidence provision and cross-examination, facts of the case, opinions of the Tribunal respectively as follows:

**I Arbitration Procedure of the case**

According to Qingdao Arbitration Commission Arbitration Rules (hereinafter as "Arbitration Rules"), the special provisions for foreign-related arbitration apply to this case.

After acceptance of the case, the Commission served the Notice of Acceptance of Arbitration Case, the Arbitration Rules, Panel of Arbitrators of Qingdao Arbitration Commission, Agreement for Composition of Arbitration Tribunal to the Claimant, and served the Notice of Defense in Arbitration, Application of Arbitration, Arbitration Rules, Panel of Arbitrators of Qingdao Arbitration Commission, Agreement for Composition of Arbitration Tribunal to the Respondent according to the Arbitration Rules. The Respondent did not submit its statement of defence within the specified period.

Within the period specified by the Arbitration Rules, the Claimant nominated Xiao Peng as the arbitrator for the case, and nominated Hu

Jiaqiang, Liu Huayi and Liu Huirong as the candidates of the presiding arbitrator; The Respondent nominated Ji Bin as the arbitrator for the case, and nominated Li Huanting and Chai Fangsheng as the candidates of the presiding arbitrator. Hence, on July 28, 2015, the Chairman of the Commission appointed Huang Haibo as the presiding arbitrator who, together with Ji Bin and Xiao Peng, formed the Arbitral Tribunal to hear the case. The Commission served the Notice of Composition of the Arbitral Tribunal and Notice of Hearing to both the parties according to the Arbitration Rules.

During the trial of the case, the Respondent filed a counterclaim. The Commission held that the counterclaim is admissible, the Tribunal agreed to hear it together with the original claim, and accepted it on September 25, 2015 and served the Notice of Acceptance of Counterclaim to the Respondent, served the Notice of Defense to the Counterclaim and Application of Counterclaim to the Claimant. The Claimant had not submitted the statement of defense within the specified period.

During the trial of the case, the Respondent applied to amend the counterclaim. The Tribunal determined to accept the amendment to counterclaim, the Commission accepted the Respondent's application to amend the counterclaim on April 1, 2016 and served the Notice of Acceptance of Amendment to Counterclaim to the Respondent, served the Notice of Defense to Amendment to Counterclaim and Application to amendment to the Claimant. The Claimant had not submitted the statement of defense within the specified period.

During the trial of the case, the Respondent requested Qingdao Arbitration Commission to collect relevant evidence as follows: 1) The Claimant's (license number: 3711940844) customs declaration forms for export goods and detailed information of export goods for each month, each quarter and each year between January 2010 and August 2015 from Qingdao Customs of PRC; 2) The Claimant's declaration form for export drawback tax returns of each quarter and each year between January 2010 and August 2015 from Donggang District Bureau of Rizhao Municipal State Tax Bureau, as well as the accounting vouchers of J&J during the foresaid period. The Arbitration Tribunal went to Qingdao Customs on June 16, 2016 and went to Donggang District Bureau of Rizhao Municipal State Tax Bureau on June 29, 2016 to make investigation and collect evidence. Donggang District Bureau of Rizhao Municipal State Tax Bureau refused to provide the relevant evidence with the reason that the tax information of tax payer shall not be provided to the arbitration institutions according to regulations of the state. Qingdao Customs provided written and stamped material (42 pages) to the Tribunal, *The Customs Declaration Form Numbers, the Trading Countries, Quantity and Amount of Mobile Shelters (HS code: 94060000) and Canopies (HS code: 63062200) exported by Rizhao J&J Manufacturing Co., Ltd. between January 20, 2010 and July 31, 2015.* The Tribunal gave the written

material to both the parties during the hearing for cross examination.

The case was heard respectively on May 30, 2016, June 6, 2016, November 10, 2016, January 16, 2017, February 17, 2017 and June 4, 2018. The Claimant's attorneys Hao Zhigang, Liu Zongxiang, and the Respondent's attorneys Zhang Meiping, Li Qinghua attended the hearings, gave statements and defenses respectively, submitted and cross-examined the evidence. The Tribunal made investigations and mediation and inquired the final opinions of both the parties.

 Ⅱ. Claims, Counterclaims and Defenses

 1 Arbitration claims and defenses

Claimant: The Claimant and the Respondent signed a Distribution Agreement on January 20, 2010. It was agreed that the Respondent, as the distributor of the Claimant, distributes such products produced by the Claimant as sports products, outdoor products, outdoor shelters, fitness equipment, trampolines and electronic products. Both the parties also agreed to apply the laws of the People's Republic of China, all disputes arising which cannot be settled through negotiation shall be submitted to the Commission, and the arbitration shall take place in Qingdao. After signing the Agreement, the Respondent purchased the ice hockey goals several times from the Claimant and resold them to other persons, but there is no transaction between both the parties in other sports products, outdoor products and outdoor shelter products.

Between March 28, 2013 and May 3, 2013, the Respondent sent order sheet to the Claimant several times in the form of emails to order ice hockey goals, and the total value of goods ordered was USD1275006.52. Between August 26, 2013 and November 21, 2013, the Claimant delivered the goods according to agreement. The facts above can be proved by the emails between both the parties, order sheets, proforma invoices, bill of lading and customs declaration forms. However, the Respondent refused to pay the goods even after the Claimant asked several times. The Respondent owed the Claimant USD1275006.52 till the date of filing the case of arbitration. Failure to pay the goods for a long term constitutes the fundamental breach of the Contract. The Claimant filed the following claims in order to protect his legal rights: 1) The Respondent pay the Claimant USD1275006.52 (According to RMB exchange rate parity of inter-bank foreign exchange market on March 9, 2015, 1 US Dollar equals to RMB6.1563 *yuan*, the equivalent RMB is 7849322.64 *yuan*); 2) The Respondent pay the Claimant interest from November 20, 2013 to the date of actual payment on the basis of the payable amount of goods at the benchmark loan rate of the People's Bank of China (RMB606439.00 *yuan* till April 2, 2015); 3) The Respondent undertake the Claimant's attorney fee and travel expense due to conducting of the case; 4) The arbitration fee of the case be undertaken by the Respondent.

The Respondent's defense:

1）There are serious quality problems in the products sold by the

Claimant to the Respondent, causing the products to be rejected by the customers. The Respondent has the right to refuse to pay the goods according to Article 8.1. Until now, due to the quality problems of the products provided by the Claimant, the Respondent still has a lot of products stored in the warehouse and cannot be sold, causing great loss to the Respondent. It is agreed in 8.1 of the Distribution Agreement, at its sole cost and expense, the Claimant shall cause rejected nonconforming units to conform to Distributor's specifications. The Respondent had asked the Claimant many times to reproduce or change the goods, but all refused by the Claimant. Therefore, the Respondent has the right to refuse to pay the goods with serious quality problems.

2）During implementation of the Distribution Agreement, the Claimant had never distributed any profit from sales of outdoor products of shelters, canopies, etc. to the Respondent according to the agreement, causing great loss to the Respondent, and the loss is much more than the amount of ice hockey goals claimed by the Claimant. The Claimant has no right to require the Respondent to pay any money, on the contrary, the Claimant should distribute profits to the Respondent and pay the penalty of breach.

3）There is not any factual or legal basis for the Claimant to require the Respondent to undertake the attorney fee, travel expense and arbitration fee, etc., and should not be supported. In the Distribution Agreement signed by the Claimant and the Respondent, only the attorney fee and arbitration fee for handling the product responsibility dispute caused by such problems as product quality and flaw can be undertaken by the breaching party, and cost for handling the dispute of payment of goods is not agreed. Therefore, there is not any basis for the arbitration claims of No. 3, 4, and should not be supported.

Overall, the facts and reasons of the Claimant in the arbitration claims are not correct, and the Respondent shall not undertake any responsibility.

## 2 Counterclaim and defense

During trial of the case, the Respondent put forward the counterclaim: In accordance with the clause 1.4 of the Distribution Agreement, "when the Distributor makes certain changes to the supplier's organization, new orders from new customers will go through the Distributor. New orders from old customers buying divisions will go through suppliers but profit will be split." After signing the Agreement, the Respondent provided a series of technical services and product upgrading of the outdoor shelters and canopies, including branding the product, establishing customer service in the United States, etc., changing labeling or packaging, redesigning the products the Claimant is infringing. In the mean time, from the date of signing the Agreement, the Claimant has sold a large quantity of upgraded products to new and old customers in North America and Europe and obtained great profits. Furthermore, it is

4

agreed in the Distribution Agreement that the Respondent has the exclusive right to distribute the products all over the world. According to Articles 3.2 and 3.3 of the Agreement, if the Claimant wants to distribute the products, it must first obtain the written approval from the Respondent. The Claimant shall not sell, distribute, market, lease or otherwise make available the products all over the world except through the Distributor. However, the Claimant has continuously violated the Agreement, especially from year 2013 till now, the Claimant has deliberately sold large quantity of products to the United States and the North America by itself and not through the Respondent. The Claimant's action has seriously violated the Agreement between both the parties and the Claimant shall pay liquidated damages to the Respondent in accordance with Article 10 of the Distribution Agreement. In conclusion, the Claimant has seriously breached the Agreement and violated the legitimate rights and interests of the Respondent. In order to protect its legitimate rights and interest, the Respondent put forward the counterclaims as follows: 1) The Claimant shall pay sales profits RMB 16881555.80 *yuan* (According to RMB exchange rate parity of inter-bank foreign exchange market on September 10, 2015, 1 US Dollar equals to RMB6.3772 *yuan*) to the Respondent; 2) The Claimant shall pay liquidated damages USD1000000.00 which is equivalent to RMB6377200.00 *yuan* (According to RMB exchange rate parity of inter-bank foreign exchange market on September 10, 2015, 1 US Dollar equals to RMB6.3772 *yuan*) to the Respondent; 3) The Claimant shall be liable for attorney fees, arbitration fees and all the other expenses arising from the claims.

During the trial of the case, the Respondent changed 1st item of the counterclaims above into: The Claimant shall pay sales profits USD1015850.95 (According to RMB exchange rate parity of inter-bank foreign exchange market on February 16, 2016, 1 US Dollar equals to RMB6.3772 *yuan*, equivalent to RMB 6478284.68 *yuan*) to the Respondent.

In view of the counterclaims of the Respondent, the Claimant defenses:

1 ) The Distribution Agreement was unilaterally drafted by the Respondent. The stipulations of this agreement are obviously unjust, unreasonable and unfair. These unjust, unreasonable and unfair stipulations had fundamentally violated the Claimant's right of independent operation and free trade, as a good-faith enterprise of China. It had constituted a violation against the fundamental principle of laws of China, thus these stipulations shall not be acknowledged in our country. The Distribution Agreement maliciously used the Claimant's distress position under the grim situation and urgent need to expand exports in order to survive, and use capital, technology, profit and other promise, to deceive the Claimant signing the unequal contract with him. The Agreement not only increased the obligation of the Claimant, deprived the

legitimate rights of the Claimant, but also undermined the Claimant's own managerial authority as an independent Chinese corporate. For the Respondent, it assumed a very small obligation, but got a great benefit and the Respondent also pre-designed a variety of exemption provisions. By the terms of the Agreement and the performing of the Agreement to show that the purpose of the Respondent was to obtain non-normal interest, the Respondent did not intend to pay in full the Claimant a reasonable price from the beginning. In accordance with the relevant provisions of the "Contract Law of the People's Republic of China", these standard terms should be found to be invalid or to be adopted the interpretation against the Respondent. These provisions include: 1.2 SUPPLIER is interested in manufacturing the Product and desires to have any and all Product exclusively distributed by DISTRIBUTOR in the name of DISTRIBUTOR all over the world. 1.3 The DISTRIBUTOR desires to exclusively distribute Product all over the world. 3.1 DISTRIBUTOR shall have exclusive right to distribute the Product all over the world. SUPPLIER shall have the right to distribute the Product by itself in all other countries excluding North America with written approval from the Distributor. The supplier shall not appoint any third party as his distributor and agent of the Product without written approval from the Distributor. 3.3

During the term of this Agreement, the SUPPLIER (including its directors, owners, officers, subsidiaries, associate companies or undertakings) shall not directly or indirectly: (i) Sell, distribute, market, lease or otherwise make available the Product all over the world except through the DISTRIBUTOR; (ii) Grant a license, franchise or any right to anyone other than the DISTRIBUTOR for the sale, distribution, marketing, leasing, production and manufacturing of the Product all over the world. 3.4 The SUPPLIER and/or its employees may help DISTRIBUTOR sell Products to the extent of prior written authorization from the DISTRIBUTOR, provided however that, it shall not affect any or all rights or interested enjoyed by the DISTRIBUTOR under this Agreement in all aspects. 3.5 DISTRIBUTOR is, and will remain at all times during and after the term of this Agreement, the sole owner of all trade secrets, patents, copyrights and all other proprietary information related to Product and drawings thereof. 9.2 During the term of this Agreement and within three (3) years after termination of this Agreement if the agreement is breached by supplier, SUPPLIER agrees that it shall refrain from communicating whatsoever and/or setting up business relationship with Customer directly or indirectly, and further agrees that in the event that any Customer contacts SUPPLIER to purchase the Product, SUPPLIER shall promptly forward said communication to DISTRIBUTOR in writing, whether said communication is by e-mail, facsimile, mail or otherwise. SUPPLIER will to pay to DISTRIBUTOR one million US dollars ( USD1,000,000.00 ), as liquidated damages for breach of Clause 3, Clause 4, Clause 5, Clause 6,   Clause 7, Clause 8 and Clause 9.2 of this

Agreement by SUPPLIER. The clauses of Distribution Agreement quoted above were unilaterally drafted by the Respondent. They are obviously unjust, unreasonable and unfair, had fundamentally violated the Claimant's right of independent operation and free trade. It had constituted a violation against the fundamental principle of laws of China, and shall not be acknowledged in our country.

2 ) The Respondent had firstly breached the "Distribution Agreement" by not fulfilling obligations of the "Distribution Agreement". The pre-conditions of the exclusive sales as well as the profit split and other applicable provisions under the "Distribution Agreement" do not exist. The Respondent's failure in performing its obligations according to the Distribution Agreement is as follows: 1) The Distribution Agreement signed by and between the Claimant and the Respondent on January 20, 2010, stipulated that the Respondent should make certain change to the Claimant's organization, then, the provision of exclusive sales, distribution of profits and other provisions can apply (Article 1.4), the so-called "make certain change to the organizations" means the Respondent change the organization by means of investment, buying the shares, joint ventures, mergers and acquisitions and other forms can change the organization. However, after the conclusion of the "Distribution Agreement", the Respondent has never made any changes to the Claimant's organization. 2) According to the Distribution Agreement, "Product" is defined as: Any product introduced or sold by the Respondent in the light of "Product Specifications" (Article 2.4). "Product Specifications" is defined as: specifications or samples the Respondent or customer required or provided (Article 2.5 Article). According to aforementioned provision, any products not introduced or sold by the Respondent, are not the Products defined by the Agreement. There is no evidence that the Claimant's products are produced according to specifications or samples provided by the Respondent. In fact, the Respondent has never provided any product specifications or samples. Therefore, the pre-condition of the exclusive sales and profit split and other applicable provisions under the "Distribution Agreement" does not exist. 3) The Respondent has never performed their obligation under the "Distribution Agreement", such as branding the product; finding customers in North American or the other countries; upgrading the new product; changing the label or the packaging; reviewing or re-designing the product which infringed other persons' rights. There is no evidence that Respondent ever provided these services to the Claimant. Particularly, the Respondent had never authorized the Claimant to use their new and old patents, according to the Agreement. 4) According to the "Distribution Agreement", the Respondent should ensure the Claimant's sales of products to increase 10% per annum within the first two years (Article 10). The Addendum A of the Agreement: A) If the annual sales is less than USD10,000,000.00, the supplier will have 8% profits before taxes. B) If the annual sales is between USD10,000,000.00 to

20,000,000.00, the supplier will have 6% profits before taxes. 3) If the annual sale is more than USD 20,000,000.00, the supplier will have 5% profits before taxes. The Respondent has never fulfilled above-mentioned obligation, or distributed any profits to the Claimant. Article 67 of "Contract Law of the People's Republic of China" stipulates "the defense of first-performance", i.e. "Where the parties owe obligations to one another, and where one obligation is to be performed first and the other subsequently, then where the party with the obligation to provide initial performance has not performed its obligation, the party with the obligation to provide subsequent performance may refuse the request of the other party to provide performance. Where the party with the obligation to provide initial performance has performed its obligation in a manner not in conformity with the parties' agreement, the party with the obligation to provide subsequent performance may refuse the corresponding request of the other party to provide performance." In this case the Respondent had firstly breached the "Distribution Agreement" by not fulfilling obligations of the "Distribution Agreement". As a result, the pre-conditions of the exclusive sales as well as the profit split and other applicable provisions under the "Distribution Agreement" do not exist.

3）The only circumstance stipulated by the Distribution Agreement where Claimant needs to split profit with Respondent does not exist in fact. The Claimant being asked to distribute profit had no basis. According to "Distribution Agreement", there is only one prerequisite that the Claimant needs to allocate profits to the Respondent, i.e., Article 1.4, " When the Distributor makes certain change to the supplier's organization...... New orders from old customers buying divisions will go through suppliers but the profit will be split." Under this article of the Agreement, the prerequisite to distribution of profit was that the Respondent should make certain change to the Claimant's organization" (including investment, buying the shares, joint ventures, mergers and acquisitions and other forms that can change the organization), however, the Respondent has never made any change to the Claimant's organization, the prerequisite of the profit split does not exist. In addition, the Respondent did not have any evidence to prove that "New orders from old customers buying divisions" were supplied by the Claimant after "Distribution Agreement" was signed. No supply, no profit, let alone distributing profits to the Respondent. According to the "Distribution Agreement", there is only one prerequisite that the Claimant needs to allocate profits to the Respondent. In the other cases, all the products sold to the third parties by the Claimant are through the Respondent, there shall be no distribution of profits from the Claimant to the Respondent; on the contrary, the Respondent needs to allocate profits to the Claimant. However, the Respondent has never assigned any profit to the Claimant.

4）There is no evidence to prove that the Claimant has ever sold any product to the foreign customers without authorization. The Respondent

8

shall bear the liability of failure of providing evidence.

5）The amount of the counterclaim of the Respondent has no grounding. The Respondent's counterclaim had no basis. The Respondent did not submit any evidence to prove that the Claimant is in breach of the contractual obligations and therefore he suffered economic losses, let alone any amount of loss. The Respondent shall bear the result of not being able to provide any evidence. As for the liquidated amount of one million US dollars, it is an unreasonable amount based upon an unfair agreement, since the Respondent cannot prove any breach of the Claimant or it has any loss, the claim of the liquidated amount has not any factual or legal basis.

In conclusion, the counter-claim of the Respondent has no factual or legal basis. The Claimant asks the Tribunal to reject any and all of their counter-claims.

### III Evidence provision and cross examination
### 1 Evidence provided by the Claimant

1)Distribution Agreement, prove: A) The Distribution Agreement was unilaterally drafted by the Respondent. The stipulations of this agreement are obviously unjust, unreasonable and unfair. These unjust, unreasonable and unfair stipulations had fundamentally violated Claimant's right of independent operation and free trade, as a good-faith enterprise of China. It had constituted a violation against the fundamental principle of laws of China, thus, these stipulations shall not be acknowledged in our country. B) The Respondent itself had breached the "Distribution Agreement" by not fulfilling obligations of the "Distribution Agreement" from the very beginning. C) According to the Distribution Agreement, the Respondent should make certain change to the Claimant's organization, then, the provision of exclusive sales, distribution of profits and other provisions can apply (Article 1.4), the so-called "make certain change to the organizations" means the Respondent should change Claimant's organization by means of investment, purchase of equity, setup of joint ventures, mergers and acquisitions and other forms that can change the structure of Claimant's enterprise. However, after the conclusion of the "Distribution Agreement", the Respondent has never made any change to the Claimant's organization. D) Furthermore, according to the Distribution Agreement, "Product" is defined as: Any product introduced or sold by the Respondent in the light of "Product Specifications" (Article 2.4). "Product Specifications" is defined as: specifications or samples the Respondent or customer required or provided (Article 2.5). According to aforementioned provision, any products not introduced or sold by the Respondent, are not the Products defined by the Agreement. There is no evidence that the Claimant's products are produced according to specifications or samples provided by the Respondent. In fact, the Respondent has never provided any product specifications or samples. Therefore, the pre-condition of the exclusive sales and profit split and other applicable provisions under the

"Distribution Agreement" does not exist. E)    The Respondent has never performed their obligations under the "Distribution Agreement", such as branding the product; finding customers in North American or the other countries; upgrading the new product; changing the label or the packaging; reviewing or re-designing the product which infringed other persons' rights. There is no evidence that the Respondent ever provided these services to the Claimant. Particularly, the Respondent had never authorized the Claimant to use their new and old patents, according to the Agreement. F) In addition, according to the "Distribution Agreement", the Respondent should ensure the Claimant's sales of products to increase 10% per annum within the first two years (Article 10). The Addendum A of the Agreement stipulated: A) If the annual sales is less than USD10,000,000.00, the supplier will have 8% profits before taxes. B) If the annual sales is between USD10,000,000.00 to 20,000,000.00, the supplier will have 6% profits before taxes. C) If the annual sale is more than USD 20,000,000.00, the supplier will have 5% profits before taxes. The Respondent had never fulfilled abovementioned obligation, or distributed any profits to the Claimant.

Respondent: No objection on the authenticity. However, A) The Contract was reached on the voluntary and equal basis, the provisions of the Contract is legal and effective. The "Contract being obviously unfair" claimed by the Claimant is completely false. B) The Respondent has performed according to the agreement in the Contract such obligations agreed in the Contract as branding the product, improve or upgrade of products, changes of labeling or packaging, revising the user's operation manual, reviewing and redesigning the products the suppliers are infringing, development and maintenance of new and old customers, thus, the Claimant should pay the relevant profit to the Respondent. C) The Claimant's explanation of the profit split clause (1.4) in the Distribution Agreement is not correct. According to the agreement in 1.4 of the Agreement, as long as the Respondent has performed the obligation or actions in Item 2 above, the Claimant should pay the relevant profit to the Respondent according to the Agreement or the mutual agreement by both the parties.

2)Detailed listing of all non-payment items, prove: From August 2013 to November 2013, the Claimant sold 28 batches of goods to the Respondent, and the total price of goods is USD 1,286,758.50, the Respondent has not paid the price of goods. The amount in the listing is more than the Claimant's arbitration claim, but we confirm the claim.

Respondent: The evidence is made by Claimant unilaterally, and we don't agree. The contents made unilaterally by one party should not be used as evidence in the case and have no evidential effect.

3)Commercial Invoice (C/I), (No: J&J213315, issued on August 22, 2013)

4)Bill of Lading (B/L) related to the above Commercial Invoice [The

original form of B/L is electronic. The Claimant has sent the electronic B/Ls and C/Is to the Respondent through email; The emails for the 28 shipments of goods (the Claimant's evidence No. 3 & 4) are shown during the hearing, and the annexes are C/Is and B/Ls].

5)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 3)-5) is for the 1st batch of goods in this case, together proves: About August 22nd, 2013, the Claimant sold one batch of Hockey Goal, Net and other goods. The total price of the goods is USD 34,680.00. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 3)-5), the Respondent's viewpoint: A) The evidence is made by Claimant unilaterally, and the descriptions of the products and prices listed on the invoice are not the same as those on the B/L. In the mean time, they are not the same as those listed in the three Customs Declaration Forms. Evidences No. 3, 4 and 5 are a group of evidences, but they are contradictive themselves. The authenticity of Evidence 4 cannot be confirmed. We only confirm the authenticity of Evidence 5. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

Claimant: All the evidences submitted by the Claimant are communications between the email of our enterprise and the emails of the Respondent's business staff (including Tomi). The identifications of the business staff of the Respondent can be shown in the large amount of evidences provided by the Respondent, and we will state in detail later; The Respondent did not give any objection after receiving the documents; Among the evidences provided by the Claimant, the most important piece is the Export Customs Declaration Form, which has been examined and sealed by Rizhao Customs. Such detailed information as description of goods, specifications, mode, port, ship, B/L number, time of shipment, value of goods is written in detail on the Export Customs Declaration Form. These pieces of information are corresponding to the information on commercial invoice and B/L, and the complete chain of evidence is formed, sufficient to prove the facts and amounts of shipment shipped by the Claimant to the Respondent; The large amount of evidences provided by both the parties exist in the electronic form, only the original customs declaration forms for export of 28 shipments of goods are issued officially by the Customs as the competent organ. If there is any flaw in other evidences, we hereby ask the tribunal to use the original customs declaration forms for export of 28 shipments of goods as the standard.

Respondent: There are three prices in the commercial invoices, 22200.00、9600.00、2880.00, however, the prices are different from those

in the three prices of 4588, 17612, 12480 in the customs declaration forms provided by the Claimant; In the commercial invoices, two descriptions are ice hockey goals, and the other is shed, but, in the three customs declaration forms provided by the Claimant, two descriptions are shed, and one is ice hockey goal. It is obvious that Evidence 3 is not in conformity with Evidence 5, and the Claimant cannot prove that the claimed goods have been delivered to the Respondent.

Claimant: The commercial invoices are documents issued from the aspect of commerce after negotiation by both the parties on buying and selling of goods. The Export Customs Declaration Form is the document for examination and release of the goods from the aspect of export goods administration. The goods under one commercial invoice are not certainly declared for export in one shipment. This can be shown from the first shipment, one commercial invoice corresponds to three customs declaration forms; The amount on the customs declaration form is the same as that on the commercial invoices.

6)Commercial Invoice (C/I), (No: J&J213398, issued on August 26th, 2013).

7)Bill of Lading (B/L) related to the above Commercial Invoice.

8)Customs declaration form for exportation related to the above C/I & B/L.

The evidence 6)-8) above is for the 2nd batch of non-payment goods: About August 26th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 6)-8) above, the Respondent's viewpoint: Evidence 6 is the invoice issued by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 7, and from the evidence itself, the consignee is not the Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 8.

9)Commercial Invoice (C/I), No: J&J213443, issued on August 28th, 2013.

10)Bill of Lading (B/L) related to the above Commercial Invoice.

11)Goods declaration form for exportation related to the above C/I & B/L

The evidence 9)-11) above is for the 3rd batch of non-payment goods: About August 28th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 44,842.77. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 9)-11) above, the Respondent's viewpoint: A)

Evidence 9 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 10 cannot be confirmed. We only confirm the authenticity of Evidence 11. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

12)Commercial Invoice (C/I), No: J&J213396, issued on September 9th, 2013.

13)Bill of Lading (B/L) related to the above Commercial Invoice.

14)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 12)-14) above is for the 4th batch of non-payment goods: About September 9th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 50,107.40. The Claimant made the export declaration of the goods, consign to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 12)-14) above, the Respondent's viewpoint: Evidence 12 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 13, and from the evidence itself, the consignee is not Claimant in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 14.

15)Commercial Invoice (C/I), No: J&J213397, issued on September 9th, 2013.

16)Bill of Lading (B/L) related to the above Commercial Invoice.

17)Goods declaration form for exportation related to the above C/I & B/L

The evidence 15)-17) above is for the 5th batch of non-payment goods: About September 9th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 55,579.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 15)-17) above, the Respondent's viewpoint: Evidence 15 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 16, and from the evidence itself, the consignee is not the Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 17.

18)Commercial Invoice (C/I), No: J&J213462, issued on September 10th, 2013.

19)Bill of Lading (B/L) related to the above Commercial Invoice.

20)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 18)-20) above is for the 6ᵗʰ batch of non-payment goods: About September 10ᵗʰ, 2013, the Claimant sold one batch of Hockey Goal Net and other goods. The total price of the goods is USD 45,253.50. The Claimant made the export declaration of the goods, consign to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 18)-20) above, the Respondent's viewpoint: A) Evidence 18 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 19 cannot be confirmed. We only confirm the authenticity of Evidence 20. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

21)Commercial Invoice (C/I), No: J&J213454, issued on September 12ᵗʰ, 2013.

22)Bill of Lading (B/L) related to the above Commercial Invoice.

23)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 21)-23) above is for the 7ᵗʰ batch of non-payment goods: About September 12ᵗʰ, 2013, the Claimant sold one batch of Hockey Goal Net, Score Board and other goods. The total price of the goods is USD 39,473.50. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 21)-23) above, the Respondent's viewpoint: A) Evidence 21 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 22 cannot be confirmed. We only confirm the authenticity of Evidence 23. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

24)Commercial Invoice (C/I), No: J&J213419, issued on September 16th, 2013.

25)Bill of Lading (B/L) related to the above Commercial Invoice.

26)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 24)-26) above is for the 8ᵗʰ batch of non-payment goods: About September 16ᵗʰ, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consign to the Respondent by means of maritime transport, but the

Respondent failed to pay the price of the goods.

In view of the evidence 24)-26) above, the Respondent's viewpoint: Evidence 24 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 25, and from the evidence itself, the consignee is not Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 26.

27)Commercial Invoice (C/I), No: J&J213467, issued on September 17th, 2013.

28)Bill of Lading (B/L) related to the above Commercial Invoice.

29)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 27)-29) above is for the 9th batch of non-payment goods: About September 17th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 44,268.00. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 27)-29) above, the Respondent's viewpoint: A) Evidence 27 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 28 cannot be confirmed. We only confirm the authenticity of Evidence 29. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

30)Commercial Invoice (C/I), No: J&J213461, issued on September 22nd, 2013.

31)Bill of Lading (B/L) related to the above Commercial Invoice.

32)Goods declaration form for exportation related to the above C/I & B/L

The evidence 30)-32) above is for the 10th batch of non-payment goods: About September $22^{th}$, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46.354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 30)-32) above, the Respondent's viewpoint: Evidence 30 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 31, and from the evidence itself, the consignee is not the Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 32.

33)Commercial Invoice (C/I), No: J&J213469, issued on September

22nd, 2013.

34)Bill of Lading (B/L) related to the above Commercial Invoice.

35)Bill of Lading (B/L) related to the above Commercial Invoice.

The evidence 33)-35) above is for the 11th batch of non-payment goods: About September 22nd, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 33)-35) above, the Respondent's viewpoint: Evidence 33 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 34, and from the evidence itself, the consignee is not the Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 35.

36)Commercial Invoice (C/I), No: J&J213486, issued on September 26th, 2013.

37)Bill of Lading (B/L) related to the above Commercial Invoice

38)Bill of Lading (B/L) related to the above Commercial Invoice

The evidence 36)-38) above is for the 12th batch of non-payment goods: About September 26th, 2013, the Claimant sold one batch of Hockey Goal Net, Wooden Support and other goods. The total price of the goods is USD 31,068.64. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 36)-38) above, the Respondent's viewpoint: A) Evidence 36 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 37 cannot be confirmed. We only confirm the authenticity of Evidence 38. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

39)Commercial Invoice (C/I), No: J&J213496, issued on September 30th, 2013.

40)Bill of Lading (B/L) related to the above Commercial Invoice.

41)Bill of Lading (B/L) related to the above Commercial Invoice.

The evidence 39)-41) above is for the 13th batch of non-payment goods: About September 30th, 2013, the Claimant sold one batch of Hockey Goal Net and other goods. The total price of the goods is USD 35,760.00. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 39)-41) above, the Respondent's viewpoint:

A) Evidence 39 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 40 cannot be confirmed. We only confirm the authenticity of Evidence 41. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

42)Commercial Invoice (C/I), No: J&J213418, issued on September 29th, 2013.

43)Bill of Lading (B/L) related to the above Commercial Invoice.

44)Bill of Lading (B/L) related to the above Commercial Invoice

The evidence 42)-44) above is for the 14th batch of non-payment goods: About September 29th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 42)-44) above, the Respondent's viewpoint: Evidence 42 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 43, and from the evidence itself, the consignee is not the Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 44.

45)Commercial Invoice (C/I), No: J&J213470, issued on September 29th, 2013.

46)Bill of Lading (B/L) related to the above Commercial Invoice

47)Bill of Lading (B/L) related to the above Commercial Invoice

The evidence 45)-47) above is for the 15th batch of non-payment goods: About September 29th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 45)-47) above, the Respondent's viewpoint: Evidence 45 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 46, and from the evidence itself, the consignee is not the Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 47.

48)Commercial Invoice (C/I), No: J&J213468, issued on October 11th, 2013.

49)Bill of Lading (B/L) related to the above Commercial Invoice

50)Bill of Lading (B/L) related to the above Commercial Invoice

The evidence 48)-50) above is for the 16th batch of non-payment goods: About October 11th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD44,268. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 48)-50) above, the Respondent's viewpoint: A) Evidence 48 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 49 cannot be confirmed. We confirm the authenticity of Evidence 50. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

51)Commercial Invoice (C/I), No: J&J213504, issued on October 10th, 2013.

52)Bill of Lading (B/L) related to the above Commercial Invoice

53)Bill of Lading (B/L) related to the above Commercial Invoice

The evidence 51)-53) above is for the 17th batch of non-payment goods: About October 9th, 2013, the Claimant sold one batch of Hockey Goal Net and other goods. The total price of the goods is USD 17,342.40. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 51)-53) above, the Respondent's viewpoint: Evidence 51 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 52, and from the evidence itself, the consignee is not the Respondent in this case. The B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 53. Moreover, both the parties signed the Agreement on Time Limit of Providing Evidence at the Commission in August 2015. It is agreed that the time limit of providing evidence shall be before September 14, 2015, otherwise the party who submit the evidence overdue shall bear the responsibility of not being able to submitting evidence. The evidence submitted by the Claimant during the hearing is overdue and cannot be regarded as evidence. The Respondent does not confirm the evidence provided during the hearing. The B/L cannot prove that the Respondent has received the goods, and the Claimant has no evidence to prove that the Respondent has received all the goods. The email shown by the Claimant is in 2011, to prove that the goods were sent to a company in Finland, but The date shown in the Claimant's evidence 51,52,53 is October 17, 2013. Obviously the difference is very big, the opinion of the Claimant cannot be proved, and it cannot prove that the Respondent has received all the goods.

54)Commercial Invoice (C/I), No: J&J213511, issued on October 18th, 2013.

55)Bill of Lading (B/L) related to the above Commercial Invoice

56)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 54)-56) above is for the 18th batch of non-payment goods: About October 18th, 2013, the Claimant sold one batch of Hockey Goal Net and other goods. The total price of the goods is USD 58,433.83. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 54)-56) above, the Respondent's viewpoint: Evidence 54 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 55 cannot be confirmed. We confirm the authenticity of Evidence 56. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

57)Commercial Invoice (C/I), No: J&J213482, issued on October 11st, 2013.

58)Bill of Lading (B/L) related to the above Commercial Invoice

59)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 57)-59) above is for the 19th batch of non-payment goods: About October 11th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 54)-56) above, the Respondent's viewpoint: Evidence 57 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 58, and from the evidence itself, the consignee is not Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 59.

60)Commercial Invoice (C/I), No: J&J213492, issued on October 21st, 2013.

61)Bill of Lading (B/L) related to the above Commercial Invoice.

62)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 60)-62) above is for the 20th batch of non-payment goods: About October 21st, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is

USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 60)-62) above, the Respondent's viewpoint: Evidence 60 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 61, and from the evidence itself, the consignee is not Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 62.

63)Commercial Invoice (C/I), No: J&J213514, issued on October 25th, 2013.

64)Bill of Lading (B/L) related to the above Commercial Invoice.

65)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 63)-65) above is for the 21st batch of non-payment goods: About October 25th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 63)-65) above, the Respondent's viewpoint: Evidence 63 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 64, and from the evidence itself, the consignee is not Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 65.

66)Commercial Invoice (C/I), No: J&J213513, issued on October 25th, 2013.

67)Bill of Lading (B/L) related to the above Commercial Invoice.

68)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 66)-68) above is for the 22nd batch of non-payment goods: About October 25th, 2013, the Claimant sold one batch of Hockey Goal Net and other goods. The total price of the goods is USD 65,305.00. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 66)-68) above, the Respondent's viewpoint: Evidence 66 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 67 cannot be confirmed. We confirm the authenticity of Evidence 68. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

69)Commercial Invoice (C/I), No: J&J213505, issued on October 25th, 2013.

70)Bill of Lading (B/L) related to the above Commercial Invoice.

71)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 69)-71) above is for the 23rd batch of non-payment goods: About October 25th,, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 35,138.60. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 69)-71) above, the Respondent's viewpoint: Evidence 69 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 70, and from the evidence itself, the consignee is not Claimant in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 71.

72)Commercial Invoice (C/I), No: J&J213515, issued on November 4th, 2013.

73)Bill of Lading (B/L) related to the above Commercial Invoice.

74)Goods declaration for exportation related to the above C/I & B/L.

The evidence 72)-74) above is for the 24th batch of non-payment goods: About November 4th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 72)-74) above, the Respondent's viewpoint: Evidence 72 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 73, and from the evidence itself, the consignee is not Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 74.

75)Commercial Invoice (C/I), No: J&J213517, issued on November 8th, 2013.

76)Bill of Lading (B/L) related to the above Commercial Invoice.

77)Goods declaration for exportation related to the above C/I & B/L.

The evidence 75)-77) above is for the 25th batch of non-payment goods: About November 8th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 75)-77) above, the Respondent's viewpoint: Evidence 75 is the invoice issued unilaterally by the Claimant himself, we

don't agree with the evidence. We don't agree with the authenticity of the evidence 76, and from the evidence itself, the consignee is not Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 77.

78)Commercial Invoice (C/I), No: J&J213516, issued on November 8th, 2013.

79)Bill of Lading (B/L) related to the above Commercial Invoice.

80)Goods declaration for exportation related to the above C/I & B/L.

The evidence 78)-80) above is for the 26th batch of non-payment goods: About November 8th, 2013, the Claimant sold one batch of Hockey Goal Net, Shoot Trainer and other goods. The total price of the goods is USD 46,354.92. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 78)-80) above, the Respondent's viewpoint: Evidence 78 is the invoice issued unilaterally by the Claimant himself, we don't agree with the evidence. We don't agree with the authenticity of the evidence 79, and from the evidence itself, the consignee is not Respondent in this case. Moreover, the B/L cannot show that the goods have been picked up by the Respondent. We confirm the authenticity of Evidence 80.

81)Commercial Invoice (C/I), No: J&J213545, issued on November 14th, 2013.

82)Bill of Lading (B/L) related to the above Commercial Invoice.

83)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 81)-83) above is for the 27th batch of non-payment goods: About November 14th, 2013, the Claimant sold one batch of Score Board and other goods. The total price of the goods is USD 60,482.50. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 81)-83) above, the Respondent's viewpoint: A) Evidence 81 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 82 cannot be confirmed. We confirm the authenticity of Evidence 83. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing.

84)Commercial Invoice (C/I), No: J&J213555, issued on November 21st, 2013.

85)Bill of Lading (B/L) related to the above Commercial Invoice.

86)Goods declaration form for exportation related to the above C/I & B/L.

The evidence 84)-86) above is for the 28th batch of non-payment goods: About November 21st, 2013, the Claimant sold one batch of Hockey Goal and other goods. The total price of the goods is USD 68,495.40. The Claimant made the export declaration of the goods, consigned to the Respondent by means of maritime transport, but the Respondent failed to pay the price of the goods.

In view of the evidence 84)-86) above, the Respondent's viewpoint: A) Evidence 84 is the invoice issued unilaterally by the Claimant himself, and we don't agree with it. The authenticity of Evidence 85 cannot be confirmed. We confirm the authenticity of Evidence 86. B) The Respondent does not have complete data about the specific quantity of goods received from the Claimant, especially those goods with consignee not being the Respondent. Whether the Respondent has received the shipment or not should be checked after the hearing. The prices and descriptions of goods on the customs declaration form are not the same as those on the invoices.

87)Commercial Invoice (C/I), No: J&J213126 and J&J213233, issued date: from March to May, 2013.

88)Bill of Lading (B/L) related to the above Commercial Invoice.

89)Goods declaration for exportation related to the above C/I & B/L

90)Bank slip, representation of nominated bank account related to the above mentioned C/I, B/L & bill of customs clearance

The evidence 87)-90) above: Trading usage between the Claimant and the Respondent is: Reaching an agreement on the transaction and transportation of each batch of goods by sending the scanning copies of C/I, B/L and other bills through E-mails. The Respondent confirmed the trade mode and paid for the goods into the bank accounted appointed by the Claimant.

In view of the evidence 87)-90) above, the Respondent's viewpoint: Both the parties signed the Agreement on Time Limit of Providing Evidence at the Commission in August 2015. It is agreed that the time limit of providing evidence shall be before September 14, 2015, otherwise the party who submit the evidence overdue shall bear the responsibility of not being able to submitting evidence. The evidence submitted by the Claimant during the hearing is overdue and cannot be regarded as evidence. We don't agree with the events to be proved.

91)A set of E-mail for demanding the payment (shown during the hearing)

The Claimant has sent a lot of Emails to demand the payment of the goods because the Respondent owed a huge amount of money for a long time, but the Respondent failed to make any reply. The group of evidence includes three emails sent by the business staff of our company to BRIAN and TOMI, business staff of the Respondent for demanding the payment. In P113 of our evidence, BRIAN answered the email, promising to pay as soon as possible.

Respondent: 1) Both the parties signed the Agreement on Time Limit of Providing Evidence at the Commission in August 2015. It is agreed that the time limit of providing evidence shall be before September 14, 2015, otherwise the party who submit the evidence overdue shall bear the responsibility of not being able to submit evidence. The evidence submitted by the Claimant during the hearing is overdue and cannot be regarded as evidence. We don't confirm the events to be proved. 2) There is not any email that can make it clear the Respondent confirming the debt, or promising to pay. To the contrary, in Paragraph 3 of Page 109 of the evidence provided by the Claimant, it can be seen that the Respondent claimed corresponding payment from the Claimant. Therefore, this group of evidence cannot prove the events claimed by the Claimant.

92)Notice of dissolution of contract and the record of express delivery

The Claimant had no choice but to terminate the "Distribution Agreement" unilaterally because the Respondent owed huge amount of money for a long time and failed to pay after demanding for many times, and informed the Respondent with written notice by international courier service, but the Respondent failed to make any reply.

Respondent: 1) Both the parties signed the Agreement on Time Limit of Providing Evidence at the Commission in August 2015. It is agreed that the time limit of providing evidence shall be before September 14, 2015, otherwise the party who submit the evidence overdue shall bear the responsibility of not being able to submit evidence. The evidence submitted by the Claimant during the hearing is overdue and cannot be regarded as evidence. 2) The Respondent can check whether it has received or not. The document was sent after the Commission has accepted the case and delivered the relevant materials to both the parties, and the Claimant sent it on August 1, 2015. The payment claimed by the Claimant is not confirmed by the Respondent. Even if the Respondent has received the document, it does not affect that the Respondent require relevant payment from the Claimant.

93)Private enterprise registration information inquiry result, legal representative information and enterprise change registration information inquiry result. To prove: The Claimant has gone through five changes of registration since its establishment on 28 January 2002, but has nothing to do with the Respondent, and the Respondent has not made any contribution to the Claimant's organizational structure.

94)The emails between the Respondent and the Outsider Mr. Mao Jianjun. To prove: The net is referred to in the Respondent's evidence (the current state is in a state of damage) is the Respondent's own purchase from the Outsider. Even if the quality problem mentioned by the Respondent existed, it has nothing to do with the Claimant.

95)The emails between the Claimant and the outsider, and between

the Respondent and the outsider. To prove: The Respondent directly contacted with the Claimant's customer in its own name, but propagated the Respondent's own products, the customer of the Claimant to disclose and berate the improper behavior of the Respondent, and alert the Claimant that the Respondent contacted them privately and to plunder the customer resources. The Respondent contacted the original important customers of the Claimant privately in his own name, trying to replace the Claimant's place, and rob the Claimant's customers.

96)Emails between the Claimant and the Respondent. To prove: A) The Respondent deducted the Claimant's payment of USD 95110.56 due to the so-called product quality without the Claimant's consent. Although the Claimant urged, the Respondent still has not been paid it; B) The Respondent has deducted the cost of the sewing machine from the payment paid to the Claimant; C) The Respondent has repeatedly overdue payment during performance of the Agreement.

97)Emails between the Claimant and the outsider, and between the Claimant and the Respondent. To prove: The Claimant proposed revised scheme of the Product 37-1398, i.e., the Respondent has not upgraded or reformed the Claimant's Product 37-1398.

98)Emails between the Claimant and the Respondent. To prove: The images of the product 37-1398 provided by the Respondent are all with the Respondent's own brand, the Claimant cannot use them. The Respondent was propagating its own brand, it did not make any contribution to the Claimant's product 37-1398.

99)Emails between the Claimant and the Respondent (5 pages). To prove: The Respondent sent the email with the product instruction of the product of 37-1112, but the instruction is for Respondents' own product, and the Claimant cannot use them. The Respondent has not revised the instruction of the Claimant's product 37-1112.

100)Emails between the Claimant and the outsider (16 pages). To prove: the outsider helped the Claimant revise the instruction of the product 37-1112, i.e., the revision of the instruction of the product 37-1112 has nothing to do with the Respondent.

101)Emails between the Claimant and the Respondent (18 pages). To prove: The Claimant sent the 37-1107 instruction to the Respondent. The Respondent sent back the instructions of his own brand, the Claimant cannot use the instructions, and the Respondent has never revised to the instruction of product 37-1107.

102)Emails between the Claimant and the Respondent (7 pages). To prove: "10 × 10 × 8, 1934878" is the only specification of shelter purchased by the Respondent from the Claimant. i.e., A) The product "10 × 10 × 8,1934878" can be identified as "the Product" in this case; B) The Respondent has not made any upgrade or improvement to the Claimant's product or packaging, and he had

only made a request for the product specifications and packaging he purchased.

103)The commercial invoice, packing list and bill of lading for which the Respondent purchased the hockey goal from the Claimant in 2011 and 2012 (altogether 261 pages). To prove: The Respondent has never fulfilled the 10% annual increase in the amount promised in the Distribution Agreement, the purchase amount in 2012 (USD 1692682.30) is less than the purchase amount in 2011 (USD 1985406.90). The Respondent has never paid the profits to the Claimant during the purchase of the goods from the Claimant, and the Respondent shall continue to perform the obligation to pay the profits according to the agreement. The purchase amount in 2012 (USD 1692682.30), the purchase amount in 2011(USD 1985406.90), and the purchase amount in 2013 (USD1286758.50), the amount of the purchase amount is less than US $ 10 million. If the purchase amount is less than US $ 10 million, the Claimant shall enjoy 8% pre-tax profit, so the Respondent shall pay USD 397187.82 per Article 3 of Addendum A of the Distribution Agreement. The Respondent has not yet paid it to the Claimant, and the Claimant reserves the right to claim separately.

104)The Claimant's audit report from 2011 to 2013, and tax statement and profit and loss statement in 2014 (34 pages). To prove: There is no distributable profit of the Claimant because of continued losses from 2011 to 2014. Even if the Claimant needs to perform the obligation of distribution profits, it does not need to do because there is no profit.

105)Part of the export of goods declaration of the Claimant in 2011, 2012 & 2013 - July 30, 2015. To prove: A) The goods exported by the Claimant from 2011 to July 31, 2015 include shelter, animal living room, garden shed and other products; B) There are different types of shelters the Claimant exported, i.e., the name of the goods listed in the customs data sheet is "live house" and is not provided in accordance with the "shelter" applied by the Respondent's application for evidence, and only some of the data provided are shelters. The data itself does not have the accuracy, legitimacy and relevance, and it cannot be used as evidence of the facts of the case.

106)Commercial invoices, packing list and bills of lading corresponding to the specification of the goods recorded in the custom declaration form. To prove: There are different types of specification for the shelter the Claimant exported. Even if the Respondent helped upgrade one of the types of goods, it cannot be regarded as all its products are upgraded. For the identification of whether the Respondent has implemented the contract to upgrade the product or not, it should be determined by economic effects of the Claimant. The Respondent claimed that the Claimant had

upgraded one model of the Product, but in fact the Claimant's exports and customer resources are continuously reduced, the price of the goods did not significantly improve, which is clearly self-contradictory with the Respondent's rhetoric.

In view of the Claimant's evidence No.93-106, the Respondent's viewpoint is: The new evidence provided by the Claimant is either the accounting report having nothing to do with the facts to be proved in this case, or the customs declaration just proving that the Claimant has exported large number of mobile shelters, and the evidence cannot support the viewpoint of the Claimant at all. On the contrary, the evidence of emails provided by the Respondent proves completely and in detail that the Respondent helped the Claimant to upgrade and improve the shelters and outdoor canopies, etc., change the labeling and packaging of products, set up customer service in USA and solve the patent infringement dispute. According to the Distribution Agreement, the Claimant should distribute profit to the Respondent in export sales of shelters, etc.

## 2 Evidence provided by the Respondent

1)Distribution Agreement. To prove: A) It is clear in Clause 1.4 that, when the Respondent makes certain change to the products, new orders from new customers must go through the Respondent; New orders from new customers can go through the Respondent but the profit will be split; When the situations listed in 1.4.1-1.4.6 happen, the orders related shall go through the Respondent, and the situations stated above include setting up customer service, changing labeling or packaging for the products sold in USA, Canada or other countries, or reviewing or redesigning the products the suppliers is infringing; B) It is clear in 3.1, 3.2 and 3.3 that the Claimant cannot sell, distribute, market, lease or otherwise make available the products all over the world except through the Respondent; the Claimant cannot grant any right to anyone other than the Respondent for the sale, i.e., the Respondent shall have exclusive right to distribute the Product all over the world; C) It is clear in Clause 10 that the Claimant shall pay to the Respondent one million US dollars as liquidated damages for breach of Clauses 3, 4, 5, 6, 7, 8 and 9.2.

The Claimant recognizes the authenticity of this evidence, but: A) First of all, in article 1.4 of the Distribution Agreement, the word "organization" has no way to be interpreted as "product". The Respondent deliberately interpreted as "product" which reveals its attempt to mislead the Arbitration Tribunal, and turn the facts upside down, and that the Respondent itself realized the fact that it had never made any changes to Claimant's organization. Secondly there is no evidence to prove the Respondent ever improved or upgraded the products of the Claimant, or, Articles 1.4.1-1.4.6 had realized. Thirdly the word "split" does not means to "separate averagely". B) For the second matter to be proved, the

Articles 3.1、3.2、3.3 did not come into effect, because these articles are conditional, which means the Respondent should first make changes to the organization of the Claimant. Now that Respondent had never made any changes to the organization of the Claimant, Articles 3.1、3.2、3.3 did not come into effect. Even if the Respondent claims it had made changes to Claimant's product so it should have the global exclusive distribution right, the Respondent did not have any evidence to prove it has fulfilled its obligation by these provisions. C) For Article 8.1, the Claimant thinks the Respondent has no standard and had never provided any specifications or standards to the Claimant. As a matter of fact the Respondent had accepted all the goods of the Claimant, had never refused or rejected any delivery of Claimant's goods. According to 8.1 of the Agreement, if there is no refusal of the goods, the Claimant should pay for the goods in full. D) The liquidated damage stipulated in Clause 10 in this Agreement is too high, and should be deemed invalid. The liquidated damage should be calculated based on the substantial financial loss of the party concerned. Hypothetically speaking, even if the Claimant breached the Agreement, there is no substantial financial loss of the Respondent at all, because it is only a middle person of international trading. E) The Clause 11.8 in "Distribution Agreement" stipulates that the Respondent should pay the price for the goods. And the Claimant shall have the right to claim for the profit which the Respondent never allocated to the Claimant. We hereby declare to reserve the right to claim for the profit. F) The Distribution Agreement was unilaterally drafted by the Respondent. The stipulations of this Agreement are obviously unjust, unreasonable and unfair. These unjust, unreasonable and unfair stipulations had fundamentally violated Claimant's right of independent operation and free trade, as a good-faith enterprise of China. It had constituted a violation against the fundamental principle of laws of China, thus these stipulations shall not be acknowledged in our country. The Respondent in its turn, had breached the "Distribution Agreement" by not fulfilling obligations of the "Distribution Agreement" from the very beginning. According to the Distribution Agreement, the Respondent should make certain change to the Claimants' organization, then, the provision of exclusive sales, distribution of profits and other provisions can apply (Article 1.4), the so-called "make certain change to the organizations" means the Respondent should change Claimant's organization by means of investment, purchase of equity, setup of joint ventures, mergers and acquisitions and other forms that can change the structure of Claimant's enterprise. However, after the conclusion of the "Distribution Agreement", the Respondent has never made any change to the Claimant's organization. According to the Distribution Agreement, "Product" is defined as: Any product introduced or sold by the Respondent in the light of "Product Specifications" (Article 2.4). "Product Specifications" is defined as: specifications or samples the Respondent or customer required or provided

(Article 2.5). According to aforementioned provision, any products not introduced or sold by the Respondent, are not the Products defined by the Agreement. There is no evidence that the Claimant's products are produced according to specifications or samples provided by the Respondent. In fact, the Respondent has never provided any product specifications or samples. Therefore, the pre-condition of the exclusive sales and profit split and other applicable provisions under the "Distribution Agreement" does not exist. The Respondent never performs their obligation under the "Distribution Agreement", such as branding the product; finding customers in North American or the other countries; upgrading the new product; changing the label or the packaging; reviewing or re-designing the product which infringed other persons' rights. There is no evidence that Respondent ever provided these services to the Claimant. Particularly, the Respondent had never authorized the Claimants to use their new and old patents, according to the Agreement. The "Distribution Agreement" appointed that the Claimant shall deal with the "rejection" substandard products and rework them at its own expense, until it meets the specifications by the Respondent (Article 8.1). The so called substandard products should be rejected by the Respondent, not the end customers. As long as the Respondent received the goods, it indicated that the product has no quality problems. And "Distribution Agreement" arranged that the Respondent has a reasonable way of knowing the Claimants' production facilities (Article 8.2). In fact, the Respondent had dispatched staff on-site to supervise the Claimant's production work, so the Respondent has the ability to do quality inspection before shipping the goods. In conclusion, the Respondent alleged quality problem was an excuse to avoid performing its payment obligation. In addition, according to the "Distribution Agreement", the Respondent should ensure the Claimants' sales of products to increase 10% per annum within the first two years (Article 10). The Addendum A of the Agreement stipulated: 1) If the annual sales is less than USD10,000,000.00, the supplier will have 8% profits before taxes. 2) If the annual sales is between USD10,000,000.00 to 20,000,000.00, the supplier will have 6% profits before taxes. 3) If the annual sales are more than USD 20,000,000.00, the supplier will have 5% profits before taxes. The Respondent had never fulfilled abovementioned obligation, or distributed any profit to the Claimant. The only circumstance stipulated by the Distribution Agreement where Claimant needs to split profit with Respondent does not exist in fact. According to "Distribution Agreement", the Claimant who had only in one case needs to allocate profits to the Respondent, namely Article 1.4 "When the Distributor makes certain change to the supplier's organization ...... New orders from old customers buying divisions will go thru suppliers but the profit will be split." Under this article of the Agreement, the pre-condition to distribution of profit was that the Respondent should make certain change to the Claimants' organization" (such as investment, purchase of

equity, setup of joint ventures, mergers and acquisitions and other forms that can change the structure of Claimant's enterprise), however, the Respondent never made any changes to the Claimant's organization, the pre-condition of the profit split does not exist. On the contrary, in other cases, all the products sold to the third parties by the Claimant are distributed by the Respondent. So the Respondent shall split profits to the Claimant. However, the Respondent has never assigned profits to the Claimant. G) The Respondent signed the Distribution Agreement legally but to cover up his illegal purpose. His real purpose is to restrict the Claimant's power to develop clients independently, expand exports and promote technology and productivity rather than perform the Agreement. So the Agreement is ineffective based on Article 52 of the Contract Law of the People's Republic of China. The business scope is almost the same between the Respondent and the Claimant. But after signing the Agreement, they didn't expand their sales market. On the contrary, the Respondent strikes and restricts the Claimant's normal selling all the time which decline the Claimant's export sales. Since 2013, the Respondent has neither purchased any goods from the Claimant nor allowed the Claimant selling them. Obviously, their behavior of the Respondent is not to aim at cooperation and develop the market but to attack competitor which has deviated from our original purpose. The Distribution Agreement is invalid and has no binding to the Claimant. H) The Respondent wants to replace the Claimant so that they can contact the Claimant's key customers in their own name without the Claimant's permission. Through their behavior, the Claimant found that the Respondent didn't mean to perform the Agreement. Their real purpose is to contact our customers. I) The 'Distribution Agreement' applies to exclusive sales and profit share clause (Article 1.4) which means that the Respondent should make some changes to the Claimant in advance. For more details, 'some changes' means the Respondent could change the Claimant structure in the form of investment, joint venture, merger and acquisition, etc. However, the Respondent did not make any change of the Claimant after signing the Agreement. To prove this, the Claimant offered its basic information on business registration. J) The Respondent did not fulfill their obligations in 'Distribution Agreement' (1.4.1 to 1.4.6) which include setting up customer service system, updating products and developing new customers, etc. K) The Respondent fallen behind in their payment for many times in the process of the performance, it has repeatedly default. L) The Respondent deducted our payment in the amount of USD 95110.56 unilaterally without any basis, constitute fundamental breach of Agreement. M) The Respondent did not achieve their obligation that the amount of export good should increase 10% per year. The amount ($1692682.30) of purchase in 2012 is less than that of the amount ($1985406.90) in 2011. N) The Respondent has never assigned to the Claimant any profit during the period of purchasing goods so the

Respondent need to fulfill their obligation to pay the profit. The purchase amount is 1692682.30 US dollars in 2012, 1985406.90 US dollars in 2011, 1286758.50 RMB in 2013. Per the Article 3 of Addendum A in the Agreement, the Claimant enjoys 8% of pre-tax profits on condition that the purchase quantity is less than $10 million. Therefore, the Respondent shall pay the profit of 397187.82 US dollars. So, we reserve the right to claim the rights. O) The Respondent did not purchase any goods from us since December of 2013 which means they will not perform the Agreement anymore. Per the principle of reciprocity of contract rights and obligations, because the Respondent has not fulfilled any contractual obligations, even if the Claimant sells the products under the Distribution Agreement, it is also for the purpose of reducing the losses caused by the Respondent's breach of agreement, so the Claimant does not constitute a breach of contract, the Respondent has no right to make any claims. In conclusion, the premise of exclusive dealing and share profit in the Agreement does not exist. The aim of the Respondent is illegal so there is no factual and legal basis for them to ask for distributing profit or performing the responsibility.

In view of the above, the Respondent's viewpoint: 1) As stated by the Respondent, the original intention of both the parties in the cooperation is that the Claimant uses the Respondent's advanced technology in the products and the marketing ability in Europe and America, the Respondent improves and upgrades the Claimant's products according to the market and customer's demand, as agreed in the Agreement, and all the improved or upgraded products are objects from which the profit shall be split. The translation in the first matter to be proved is an objective translation, and there is no purpose or action of distortion of the Agreement. 2) The Claimant keeps claiming that the Respondent shall make changes to the organization of the Claimant. It is false according to the Agreement and the existing conditions of cooperation of both the parties. There are two reasons: first, during the first hearing, the Respondent stated that there has been no communication between both the parties on the so called "change of organization" from the date of signing the Agreement, and there has been no document to prove that the Claimant has claimed the event upon the Respondent. If change of organization is the real intention in both the parties' cooperation, the Claimant's not claiming or requiring at all is obviously not reasonable; Second, the profit distribution is agreed clearly in the Agreement, and the Respondent has evidence to prove the agreed proportion of profit by both the parties. If the Respondent needed to make any change on the organization of the Claimant according to Claimant's claim, including joint venture, acquisition and merging, the profit should have been distributed according to the proportion of shares after joint venture, acquisition or merging instead of being agreed in a distribution agreement. As for the second point, the Respondent uses the Chinese translation in the Agreement, and we think "split" shall be translated as

"equally divide", since if it were not the real intention of both the parties, as an important clause in the Agreement, the proportion of profit distribution should have been agreed clearly. 3) The Claimant holds that the Distribution Agreement signed by both the parties is "a legal form concealing illegal purpose". This is a groundless statement. The Claimant said that the Respondent "strike and restrict the Claimant's normal sales" after signing the Distribution Agreement. This is completely incompatible with the facts. In fact, The Respondent had been assisting the Claimant to improve the product manufacture scheme and quality of the product, helping the Claimant deal with service after sale. The Respondent sent technical staff to provide technical direction in field from 2011 to 2013 in the Claimant's factory. All the works and measures taken by the Respondent were to improve the quality and sale of Claimant's products, and to realize win-win of both the parties. There was not any "illegal purpose". Moreover, after filing the case in Qingdao Arbitration Commission, the Claimant sent the Notice for Cancelling Contract to the Respondent on August 1, 2015. This can also prove that the Claimant had been accepting the effectiveness of the Contract all the time. Therefore, the Main Contract in this case is representing the real meanings of the two sides, there is nothing violating the law or public interest of the society. The Contract is authentic and effective. 3) All the communications between the Respondent and the old customer of the Claimant are in representative of the Claimant to help the customer to solve problems in product upgrading and installation, and the Respondent also sent a copy of email in time to let the Claimant know about the contents of the communication. "Contact original important customer of the Claimant in name of private person" never happened. 4) The Claimant holds that the prerequisite of exclusive distribution and profit allocation of the Claimant is to change the organization of the Claimant. This is not true and contrary to the agreement of the Contract and the objective cooperation: First, Article 4 of the Distribution Agreement, "relation between the supplier and the distributor" clearly defines the relation between both the parties, i.e., the relation of buy and sell, and there is not any type of joint venture. The Claimant claiming that the Respondent should set up with the Claimant the relation of contribution, investment, acquisition or joint venture is to distort the contents of the Contract on purpose. Second, after both the parties signing the Contract in January 2010, the business relation and more than thousand emails (The Respondent submitted nearly 600 emails as evidence) between both the parties are all about the product specification, product improvement and product quality, etc., none of the emails mentioned about the so called "change of the organization". In addition, in October 2010, JENNY ZHANG of the Claimant sent to the Respondent an email, stating very clearly: The price offer to the customer already included 8%, the profit which the Respondent should get. This can also prove that the Claimant and the Respondent did not regard change of

the organization as the prerequisite of profit distribution. Actually, the view of the Claimant is not true from the common sense. Usually, if both the parties had agreed to have the "change of organization" be the prerequisite of distribution of profit, why the Claimant never submitted any request or communicated with the Respondent? Why both the parties never had any communication on the specific scheme or time of changing the "organization"? Obviously, the Claimant knows clearly that the relation between both the parties is buyer and seller, and there is no agreement that the change of organization shall be the prerequisite of the distribution of profit. 5) The series of evidence submitted by the Respondent prove that the Respondent performed such obligations specified in 1.4.1-1.4.6 of the Distribution Agreement as upgrading products, setting up customer service, changing labeling or packaging. 6) In this case, the mode of cooperation between the Claimant and the Respondent on mobile shelters is that the Respondent helped the Claimant to upgrade and reform the product, then the Claimant sold the product directly to the customer, the customer paid directly to the Claimant, and the Claimant split the profit to the Respondent according to the Distribution Agreement. What the Respondent is claiming is the profit that the Respondent should get but has not got from the Claimant. Therefore, for the sale of mobile shelters, the Claimant should distribute profit to be distributed, and there is no so called "Overdue payment of the Respondent". 7) USD95110.56 deducted by the Respondent was not all for the quality problem of the product, and is listed in detail in P26 of the Respondent's evidence, including 2 sewing machines in 2011, the USP freight for sending 2 sewing machines to JJ in 2010 and cost of sewing machines in 2010. They exactly prove that the Respondent provided relevant equipment for improving the products. 8) As stated in 5) above, the mode of cooperation between the Claimant and the Respondent on mobile shelters is that the Respondent helped the Claimant to upgrade and reform the product, then the Claimant sold the product directly to the customer, the customer paid directly to the Claimant. Hence, the Respondent is not able to get to know the total amount of annual export of the Claimant. The Respondent asked the Claimant many times through emails to tell the information of total amount of annual sale, but the Claimant never answered or provided relevant data. In fact, according to the export data of the Claimant between January 20, 2010 and July 31, 2015, the total export amount increased greatly year by year during the period above. 9) The cross-examination opinions of the Claimant are entirely groundless, and they are the intentionally distorted explanation of the contents of the Distribution Agreement: First, as stated above, the Claimant should distribute profit to the Respondent for sales of mobile shelter, outdoor canopies, etc., there is not any condition or reason for the Respondent to distribute profit to the Claimant; Second, even if "The Respondent purchased goods from the Claimant" as stated by the

Claimant refers to the hockey goals, since there are serious problems in quality of the hockey goals, they are not in accordance with the quality control and specifications, according to Article 8 of the Distribution Agreement, the Respondent has the right to refuse to pay for the goods; Third, even if "The Respondent purchased goods from the Claimant" as stated by the Claimant refers to the hockey goals, according to the arbitration application of the Claimant, the total amount of goods ordered from the Claimant by the Respondent from March 28, 2013 to May 26, 2013 is USD1275006.52, which has great difference and contradiction with the export data stated by the Claimant in the cross-examination opinions; Fourth, according to Article 3, Addendum A of the Distribution Agreement, it is "Annual Sales of the Claimant" instead of purchase of the Respondent was agreed, the Claimant distorted the explanation of the contents of the Contract on purpose. Thus, the cross-examination opinions and the claims of the Claimant are completely groundless and unreasonable. 10) In this case, the mode of cooperation between the Claimant and the Respondent on such outdoor products as mobile shelters is that the Respondent helped the Claimant to upgrade and reform the product, and then the Claimant sold the product directly to the customer. According to the data reported by the Customs, from December 2013, the Claimant has exported a large number of mobile shelters, the sales of the Claimant did not go through the Respondent, seriously violated the exclusive distribution agreement in the Contract. The Claimant also admitted in the cross-examination opinion hereby that the Claimant did the sales not through the Respondent.

2-1 Complaining emails on the quality of ice hockey goals from clients. To prove: The ice hockey goals which the Claimant sold to Respondent have serious quality problems; 2-2 Excel table. To prove: The statistics for the complaining on quality of ice hockey goals in April of 2013; 2-3 Emails correspondences between Respondent and Claimant. To prove: Respondent has communicated the quality problems of ice hockey goals with Claimant many times. The three groups of evidence above prove jointly that, 1) There are serious quality problems in the ice hockey goals sold to the Respondent by the Claimant. 2) The ice hockey goals are parts of the 28 shipments of goods claimed by the Claimant, from several shipments. 3) When the quality problem appeared, in the process of communication with the user, the Respondent notified the Claimant of the quality complaining. Both the parties signed the Agreement in 2010, the business of ice hockey goals took place after signing the Agreement, and there were severe quality problems in the Claimant's products from the beginning of the business. The period of emails is from 2011 to 2013, and there is feedback of quality problem in the email. The receivers of the Claimant include Jenny Zhang, jjtool and jjmichael, and the address of the emails above are all belong to the staff of the Claimant, being clearly shown in the emails provided by the Claimant. However, the Respondent

could not find out during the hearing in which email the Respondent negotiated with the Claimant about the quality problem.

The Claimant's viewpoints: 1) The Respondent is a foreign enterprise. All the evidence submitted by the Respondent is originated from a foreign country. These evidences should be notarized and certified before it can be effective evidence in China. However, the Respondent did not notarize or certify the evidence, as a result, these evidence should not be accepted in the arbitration tribunal in China. 2) Through comparison between the evidence submitted by the Respondent during arbitration hearing and that evidence they submitted before the time limit for adducing evidence, the 2 sets of evidence cannot match. The pieces of evidence submitted by the Respondent are all beyond the time limit for adducing evidence, as a result the Respondent should bear the liability of failure of adducing evidence. 3) All the pieces of evidence submitted by the Respondent are photocopies, without any originals to support. So the authenticity of the evidence is not affirmed. 4) The Respondent failed to display originals of the email evidence during arbitration hearing, so the authenticity of these emails evidence cannot be affirmed. 5) From the contents of the evidence we can see that Respondent's claims are based on the unilateral statement of itself. The Claimant had never confirmed any facts claimed by the Respondent. If the Respondent's statement that the customer complained of the product quality and there is loss to the Respondent were true, the Respondent should have provided evidence to prove that the Respondent had made compensation to the customer or there had been legal dispute between the Respondent and the customer, there should be overseas legal documents to confirm the product quality problem and the duty of compensation, however, the Respondent has not provided any relevant evidence. 6) The Respondent refused to admit that it had received the goods during the first hearing. However, it submitted evidence to attempt to prove the "quality problems" of the goods, and the "service" it provided for the goods in this hearing. The Respondent's arguments and evidence are self-contradictory, which reveals that the Respondent has no integrity and credibility, and all of its arguments and evidence are for the only purpose of not paying for the goods. 7) The evidence submitted by the Respondent to prove quality problem is in the form of photos. The products in the photos cannot be proved to be the products produced and delivered by the Claimant. The photos cannot prove that there were quality problems in the products at the time of leaving the factory or after being used by the Respondent. 8) The problem that the Respondent's claim is the quality of the net. But the Respondent contacted with the supplier directly. It has nothing to do with the Claimant, thus, the claimant does not need to be responsible for it. 9) Although there is no quality problem in the Claimant's products, the Respondent still deducted US $95110.56 from the payment forcibly. The Claimant urged the Respondent to many times pay, but the Respondent refused to do it. 10) The evidences which the Respondent submit all

belong to their unilateral statement. The Claimant never recognized it before. The quality problem which the Respondent claimed also does not have any identification or certification by a third-party institution. Besides this, they even do not have judicial documents by foreign court which is enough to show that there is no quality dispute between the Respondent and foreign customers. In conclusion, the evidence is far from proving that the Claimant breached the Agreement, but proves that the Respondent breached the Agreement.

The Respondent's viewpoint: The evidence of email on 269 page proves that the Respondent only provided the hockey goal sample and the specification requirements and the Claimant shall purchase the raw materials on its own in China for production; The dispute on the fund of US$95,110.56 focuses on shelters and is irrelevant with hockey goals; The several hundreds of emails submitted by the Respondent complaining on the hockey goals were all forwarded from the third party, EZGOAL's after service center's email box (service@ezgoal.net) and were only a part of the emails. The Claimant not only ignored the quality problems of its own products, but also ignored the complaints from thousands of emails and denied the existence of these quality defects.

3-1 Email correspondence, P312-340. To prove: The Respondent provided zipper machine and UV machine to Claimant, helped Claimant adopt new technology, speed the production efficiency and improve the quality, and the zipper machine and UV machine were sold to the Claimant; 3-2 Email correspondence, P341-372. To prove: Respondent helps Claimant revise and finalize the products advertisement on Global Source Magazine; 3-3 Email correspondence, P373-407. To prove: Respondent helps Claimant revise and finalize its PPT proposal to CTC; 3-4 Email correspondence, P408-500. To prove: Respondent helps Claimant improve shelters, canopies, etc. which are supplied to CTC; 3-5 Email correspondence, P501-519. To prove: Respondent helps Claimant on after-sale service and maintain client via emails and meeting with CTC; 3-6 Email correspondence, P520-600. To prove: Respondent helps Claimant do the photo-shoots for products manual and advertisements, revise and finalize the shelter manual; 3-7 Email correspondence, P601-651. To prove: Respondent helps Claimant solve the patent case; 3-8 Email correspondence, Page 652-667. To prove: Respondent helps Claimant improve the packaging; 3-9 Email correspondence, Page 668-678. To prove: Respondent helps Claimant make the frames more sturdy; 3-10 Email correspondence, Page 679-703. To prove: Respondent helps Claimant revise and finalize the canopy manual; 3-11 Email correspondence, Page 704-705. To prove: Products like shelters, etc. sold online by CTC which is Claimant's client are the new products which have been improved by the Respondent. The evidence above jointly proves that the Respondent has improved and upgraded the Claimant's products, including but not limited to shelters and canopies, and the

prerequisite of splitting profits was met, thus, the Claimant should split the relevant profits with the Respondent according to the Agreement and other agreements of both the parties.

The Claimant's viewpoints: 1) The Respondent is a foreign enterprise. All the evidence submitted by the Respondent is originated from a foreign country. These evidences should be notarized and certified before it can be effective evidence in China. However, the Respondent did not notarize or certify the evidence, as a result, these evidence should not be accepted in the arbitration tribunal in China. 2) Through comparison between the evidence submitted by the Respondent during arbitration hearing and the evidence they submitted before the time limit for adducing evidence, the 2 sets of evidence cannot match. The evidence submitted by the Respondent is all beyond the time limit for adducing evidence, as a result the Respondent should bear the liability of failure of adducing evidence. 3) All the pieces of evidence submitted by the Respondent are photocopies, without any originals to support. So the authenticity of the evidence is not affirmed. 4) The Respondent failed to display originals of the email evidence during arbitration hearing, so the authenticity of these emails evidence cannot be affirmed. 5) From the contents of the evidence we can see that Respondent's claims are based on the unilateral statement of itself. The Claimant had never confirmed any facts claimed by the Respondent. If the Respondent's statement that the customer complained of the product quality and there is loss to the Respondent were true, the Respondent should have provided evidence to prove that the Respondent had made compensation to the customer or there had been legal dispute between the Respondent and the customer, there should be overseas legal documents to confirm the product quality problem and the duty of compensation, however, the Respondent has not provided any relevant evidence. 6) The Respondent refused to admit that it had received the goods during the first hearing. However, it submitted evidence to attempt to prove the "quality problems" of the goods, and the "service" it provided for the goods in this hearing. The Respondent's arguments and evidence are self-contradictory, which reveals that the Respondent has no integrity and credibility, and all of its arguments and evidence are for the only purpose of not paying for the goods. 7) The evidence submitted by the Respondent to prove quality problem is in the form of photos. The products in the photos cannot be proved to be the products produced and delivered by the Claimant. The photos cannot prove that there were quality problems in the products at the time of leaving the factory or after being used by the Respondent. 8) In view of the Respondent's evidence 3-1, the Claimant's viewpoint: ①The page 312 to 313 in the evidence is about a sewing machine. We do not recognize the authenticity of the evidence because what the Respondent mentioned was a zipper device. The contents of the E-mail have no connection to the Claimant and the photo in the attachment shows that the

date of the equipment is from May 25, 2006 to October 31, 2006. The time difference is obviously great between the sending time and time of the annex. ②The page 314 in the evidence shows that the efficiency of the machine is much lower than that of the Claimant. Per the page 317, the Respondent and the Claimant buy the equipment from the supplier respectively so it cannot prove that the Respondent take the initiative to promote our production technology. ③ At the bottom half part of the Evidence P 317, it can be seen that the Respondent bought this sewing machine just on the basis of the specifications the Claimant gave. But the Respondent never provided the Zipper equipment to the Claimant. So, the Respondent just played a role as an agent. Per the provisions of the civil law, the legal effects attribute to the principal, it can only show that the Claimant replaced equipment by itself instead of the Respondent's technology support. So even if the working efficiency of the sewing machine improved a lot, it also has nothing to do with the Respondent. ④The cross-examination view of the Respondent on page 312 to 314 refers to the opinion that they purchase the devices from supplier. The E-mail mentioned that the head of the Respondent, Brian, ordered sewing machine from supplier in the United States in February 2010. It cannot prove that it was ordered from the Claimant or it has been provided to the Claimant. ⑤The cross-examination view of the Respondent on page 324 to 327 is not true. Based on the Claimant's instruction, the Respondent purchased the machine. The relationship between both the parties is buyer-seller relationship. So, it has no connection with improving production efficiency. ⑥In the cross-examination view of the Respondent, it can be seen that the Respondent purchased the machine according to the Claimant's instruction. The Respondent bought the machine as an agent. So, it has no connection with improving production efficiency. 9) In view of the Respondent's evidence 3-2, the Claimant's viewpoint: The Respondent just assisted the Claimant revise part of the propaganda text. At the revision process, the Respondent had lost connection for several times. And there are many marking errors in the text. The potential customers, who carry on the inquiry in the propaganda process, have been already connected with the Respondent. So, there is no evidence to prove that the Respondent provided any new technical supports or develops new customers for the Claimant. What's more, the content of this evidence does not constitute any of Article 1.4 of the Distribution Agreement, so it cannot prove the Respondent could enjoy the exclusive rights or the right to share profits. 10) In view of the Respondent's evidence 3-3, the Claimant's viewpoint: The authenticity of evidence shall not be accepted, because the Respondent did not show the email in court, unable to confirm that the attached PPT is the email attachments. Even if the evidence is true, it also cannot prove that the Respondent fulfilled the obligation in Article 1.4 in the Distribution Agreement. This evidence just set forth that the Respondent has assisted the Claimant modified part of the text in PPT

which was prepared for propagandizing CTC to the customers. This has nothing to do with this case to be proved. 11) At the middle part of Evidence page 408 is the E-mail that the Claimant sent to the Respondent, clearly set forth that the attachment is the improvement scheme of 37-1398 goods which was proposed by the Claimant. The Claimant suggested changing the goods' bracket to the bevel, and hoping the Respondent can provide some advice. The half part of this page is the Respondent's email which confirmed the work of the Claimant. On the upper half part of page 417 is the E-mail sent by the Respondent. It clearly specified the text which needed to be modified, without providing any suggestions to the products needing to be improved. The manual mentioned in page 454 and 457 is the Respondent's own propaganda for his own products, not applicable to the Claimant. The modified proposal was proposed by the Claimant, not the Respondent. The Respondent only assisted modifying the verbal expression of the product introduction, and it is also the propaganda for the Respondent's own product, which cannot prove the Respondent has provided any new technical supports. 12) In view of the Respondent's evidence 3-5, the Claimant's viewpoint: At the upper half part of page 501, the Claimant severely criticized the activities of the Respondent contacting its customer in private. In the middle part, the customer also severely criticized the Respondent's behaviors. On page 501 to 502 and 508, the Respondent propagandized their own brand to the Claimant's customer in private. ShelterIt is the brand and trademark of the Respondent's product. The evidence cannot prove the Respondent provided the service for customer according to the Agreement, on the contrary, it can prove that the purpose of the Respondent to contact with the Claimant's customer is to replace the Claimant and rob the Claimant's customer source. 13) In view of the Respondent's evidence 3-6, the Claimant's viewpoint: No proof to prove that the Respondent provided any help for the Claimant's propaganda work. On the contrary, it can prove that the Respondent has never revised or improved the product manual symbolically. The Respondent just simply provided their own propaganda material without revising or amending the Claimant's material. The Claimant cannot use the material or use it as reference because it has the Respondent's own trademark on it. In addition, it can be seen on page of 568 (May 4) and 592 (May 11) in the email, the Claimant had urged the Respondent two times to revise our product manual but the Respondent ignored. 14) In view of the Respondent's evidence 3-7, the Claimant's viewpoint: The email in Page 637 is just a tort issues for the opinions of the Claimant. However, the Respondent did not give the Claimant a clear opinion. In Page 648 in the email, it was mentioned that the Respondent did not handle things relating to infringement rather than having handled them. As for how to deal with the infringement, there is no evidence to prove. All the statements are from the Respondent without being confirmed by the Claimant. The evidence can only prove that both the

parties talked about patent dispute issues in the email but it cannot prove that the Respondent has helped the Claimant handle them or performed the obligation of "Review and redesign the products the suppliers is infringing" in the Article 1.4.6 of the Agreement. 15) In view of the Respondent's evidence 3-8, the Claimant's viewpoint: In the middle part of email in the page 653, one of the working staff of the Respondent said 'the attachment is our 10 x 10 x 8, 19384878 shelter order manuals'. In page 661 in the email he said 'we have confirmed the packaging information of the shelter order......'. So, the 10 x 10 x 8, 1934878 shelter was ordered by the Respondent. They provided their own product specifications for only one time. The products were exported only to the Respondent therefore there is no evidence to prove that the Respondent helped us to improve the packaging system of the product. 16) In view of the Respondent's evidence 3-9, the Claimant's viewpoint: This evidence exactly proves that the idea of reinforcing the product structure was provided to the Respondent by the Claimant. Based on email in the page 675, the conclusion can be drawn that the Respondent's claim is the other way around. 17) In view of the Respondent's evidence 3-10, the Claimant's viewpoint: The emails between the working staff are all the Respondent's unilateral statements which have no connection with the case. Also, it cannot prove that the Respondent has helped the Claimant to modify the instruction. 18) In view of the Respondent's evidence 3-11, the Claimant's viewpoint: The authenticity is not recognized, no connection with this case.

In view of the Claimant's viewpoints above, the Respondent's point of view: 1) The sewing machine mentioned in the evidence is the zipper machine claimed by the Respondent for production of zippers. The working efficiency of it is much higher than the old equipment. The email sent by Jenny to Brain in P327 can prove it. Moreover, P26 of the new evidence submitted by the Claimant about the cost of two sewing machines in the statement of account in 2011 can also prove the fact that the Claimant bought two zipper machines from the Respondent. 2) They are garbled statement of the Claimant. The email in P358-359 proves that Brian helped the Claimant to revise the draft of advertisement and determined the final version. 3) The email in P373 is the answer from Brian to Jenny, telling Jenny that the Addendum is the advertisement PPT revised and completed, asking Jenny to provide pictures of new products. The PPT is for recommending the new products to the important customer CTC. The assistance of the Respondent in revising the PPT is an important reflection on the Respondent's helping the Claimant in upgrading products and setting up customer service. 4) The Claimant garbled from the contents of the email, without being clear about the contents totally groundless. ① P408 of the evidence proves that the Claimant asked suggestion from the Respondent on the improvement scheme of the product, the contents of the Addendum in P409-414 are the initial scheme

of the Claimant; P415 of the evidence proves that Jenny sent an email to Brian, asking Brian to help to finish the improvement scheme of three products of the customer CTC, and Brian helped and completed the scheme; In P417 of the evidence, Jenny sent an email to Brian again, asking Brian to give specific explanation on the improvement plan and the specific advantage. Brian gave detailed answer, and suggested Jenny to take better pictures for advertisement; In P418-423, the Addendum revised by Brian proves that the Respondent gave detailed complementary explanation comparing with P409-414 of the document provided by the Claimant; The email in P424-426 proves that Jenny provided new product pictures according to the suggestions of Brian; The email in P427-433 proves that Brian accepted the new pictures provided by Jenny and upgraded the contents of the annex; The email in P434-440 proves that Jenny noticed Brian, the customer CTC accepted all the improvements made by Brian upon the products. All the improvement measures related to the 37-1398 shelters in the emails above were put forward by the Respondent and helped the Claimant to finish them. Although the Claimant made the initial PPT document for the improvement measures, the key wording was revised by the Respondent; Also, when the Claimant's customer CTC required for further explanation of the improvement measures, the Claimant had no choice but asked help from Brian. Suppose these improvement schemes had been made by the Claimant, it would be ridiculous that the Claimant could not even tell the fundamental principles and reasons of the product! Like the saying "Know how, Know why". It is obvious that all the improvement measures of the products were given by the Respondent and completed with the help of the Respondent. ② The email in P441-500 proves that the Respondent helped the Claimant make the new user's manual for the products. Those in P441-453 are contents of the user's manual provided to the Claimant, and those in P480-492 are the contents of the manual revised by the Respondent. Obviously, there are many changes in the later version comparing with the old version; The email in P498-500 proves that Brian took new advertising pictures for the manual, Jenny accepted them completely and used them in the advertisement brochure. Actually, in the present user's manual for products being sold to CTC customer, the version revised by the Respondent and the advertisement pictures provided by the Respondent are still being used. The user's manual of product is an important part of the product. The evidence above proves in detail that the Respondent helped the Claimant make many improvements on 37-1398 shelters and revised the user's manual. 5) The Claimant garbled from the contents of the email, without being clear about the contents, and the cross-examination opinions on the evidence 3-5 are totally groundless. In P513, Brian sent an email to the third party CTC customer, stating clearly that the price of the ShelterIT shelter would be offered by the Claimant soon; Also, Brian expressed gratitude to CTC for

visiting JJ company at beginning of the email, and recommended to CTC many times the experiences and products of the Claimant. Obviously, during communications with the customer CTC, the Respondent had never hidden the Claimant, on the contrary, represented the Claimant all the time as one party together with the Claimant. Therefore, the cross-examination opinions of the Claimant are garbled and totally groundless. 6) The Claimant garbled from the contents of the email, without being clear about the contents, and the cross-examination opinions on the evidence 3-6 are totally groundless. In P529-533, the email, proves that the Claimant required the Respondent to provide pictures of the product, and the Respondent provided the original diagram of the product he took in USA to the Claimant; In P542-548 of the evidence, the email and its annex, prove that the Respondent helped the Claimant revise the advertisement leaflet of the outdoor canopies. In P568 of the evidence, the email, proves that Jenny accepted and thanked Brian for the design and improvement of the advertisement leaflet for outdoor canopies, in the mean time, hoped Brian to help to revise the user's directions for shelters with the model of 10x10. Helping to revise and perfect the advertisement leaflet is an important aspect to improve the product, hence, the evidence 3-6 shows and proves in detail that the Respondent helped the Claimant improve the product of outdoor canopies. 7) The Claimant garbled from the contents of the email on purpose, or the translation and understanding of the contents of the email are one-sided and mistaken. For the email of the Claimant in P637 of the evidence, asking for help, the Respondent gave clear answer in the email in P648 of the evidence: The Respondent has communicated with the American lawyer, and the conclusion is that it is better not to answer for the infringing case; The Respondent provided relevant revision for the product of the Claimant, in the mean time, the Respondent had applied before for the related patent (pending), hence, to deal with the case with the two measures above. Moreover, the email in P601-636 and the Addendum also prove that the Respondent had reminded the Claimant seriously about the risk of infringing patent, and provided the patent documents obtained by the Respondent in USA for the Claimant to study. 8) According to Article 2.4 of the Distribution Agreement, there are two types of products under the Contract, the first type is all the products manufactured or produced by the Claimant with specifications provided by the Respondent. The evidence 3-8 proves that the Respondent provided the model of the $10 \times 10 \times 8$ shelters which were produced by the Claimant, and the new evidence submitted by the Claimant also proves it. Obviously, the Claimant does not understand the contents of the Contract correctly. However, the cross-examination opinions of the Claimant just prove the viewpoint of the Respondent. 9) The translation and understanding of the email contents by the Claimant are completely wrong. The email and its Addendum in P674-678 of the evidence prove that the technician King sent by the Respondent to work in the Claimant's factory asked Brian

about relevant questions on the new products obtained from Shelterlogic; The email in P675 proves that Brian answered the questions in detail, pointed out the shortcomings of the product, provided suggestions for improvement, and copied the email to relevant person in charge. Hence, "Claimant provided reinforcement structure himself" stated by the Claimant is the totally misunderstanding of the evidence. 10) The Respondent helped the Claimant to revise and complete the user's directions of the car shelters, and provided the advertisement pictures in the directions. 11) The screenshot of the goods on sale in the CTC website is authentic and effective.

4-1 Excel table for sales amount of shelter and canopy. To prove: The total amount of shelters and canopies which Claimant has sold to CTC and CPI in year 2010, 2011, 2012 and 2013. The Evidence 4-1 comes from the Claimant, since the cooperation between the Respondent and the Claimant, two of the Respondent's staff members were sent to the Claimant's place one by one to do the technical instruction in field and communications of relevant matters. The evidence was obtained from the staff of the Claimant; 4-2 Email correspondence, Page736-761. To prove: The orders which is placed by the Respondent to Claimant shows that new products are still ordered after May of 2013. It relates with the point of new customer and old customer in 1.4 of the Agreement. When the product is improved, the business with new customer must go through the Respondent. Menard is a new customer, and the order shall be made from the Respondent to the Claimant. The evidence is mainly to prove that there is business between the new customer and the Claimant, but the Respondent cannot control the income from the sale, and the Claimant has not distributed any profit to the Respondent according to the Agreement. The evidence is the basis of part of the profit distribution to the Respondent; 4-3 Email correspondence, Page 762-767. To prove: All the cost information of products which Respondent obtained from the Claimant. The evidence is the internal production cost of the Claimant to prove the difference between the cost and sales price of the product of the Claimant, so as to measure and calculate the profit distribution of the Respondent; 4-4 Email correspondence, Page 768. To prove: The Claimant committed 8% profit to the Respondent for the sales of new products in accordance with Agreement. It directly proves that the agreement in sales profit distribution proportion of the product under the Agreement shall be on the basis of 8%.

The Claimant's viewpoint: 1) The Respondent is a foreign enterprise. All the evidence submitted by the Respondent is originated from a foreign country. These evidences should be notarized and certified before it can be effective evidence in China. However, the Respondent did not notarize or certify the evidence, as a result, the evidence should not be accepted in the arbitration tribunal in China. 2) Through comparison between the

evidence submitted by the Respondent during arbitration hearing and the evidence they submitted before the time limit for adducing evidence, the 2 sets of evidence cannot match. The pieces of evidence submitted by the Respondent are all beyond the time limit for adducing evidence, as a result the Respondent should bear the liability of failure of adducing evidence. 3) All the evidences submitted by the Respondent are photocopies, without any originals to support. So the authenticity of the evidence is not affirmed. 4) The Respondent failed to display originals of the email evidence during arbitration hearing, so the authenticity of these emails evidence cannot be affirmed. 5) From the contents of the evidence we can see that Respondent's claims are based on the unilateral statement of itself. The Claimant had never confirmed any facts claimed by the Respondent. If the Respondent's statement that the customer complained of the product quality and there is loss to the Respondent were true, the Respondent should have provided evidence to prove that the Respondent had made compensation to the customer or there had been legal dispute between the Respondent and the customer, there should be overseas legal documents to confirm the product quality problem and the duty of compensation, however, the Respondent has not provided any relevant evidence. 6) The Respondent refused to admit that it had received the goods during the first hearing. However, it submitted evidence to attempt to prove the "quality problems" of the goods, and the "service" it provided for the goods in this hearing. The Respondent's arguments and evidence are self-contradictory, which reveals that the Respondent has no integrity and credibility, and all of its arguments and evidence are for the only purpose of not paying for the goods. 7) The evidence submitted by the Respondent to prove quality problem is in the form of photos. The products in the photos cannot be proved to be the products produced and delivered by the Claimant. The photos cannot prove that there were quality problems in the products at the time of leaving the factory or after being used by the Respondent. 8) The Respondent confirmed just now that two of their staff members were sent to the Claimant's place one by one to do the technical instruction in field and communications of relevant matters. This shows that the Respondent has complete ability to monitor and instruct the production of the Claimant as well as to make inspection before shipment. Therefore, the Respondent's statement that they received the complaining of the quality problem after the goods were resold to the final customer is not reasonable, and it is not the responsibility of the Claimant. The Claimant has not found Evidence 4-4, the record of the email. Moreover, from the contents of the email, it can be seen that it is the discussion of the prices of four products in October 2010, there is no relation with this case. 9) Evidence 4-1, authenticity is not recognized, no connection with this case. Evidence 4-2, it has no connection with this case, refusing to make cross-examination. Evidence 4-3, it can only prove that the Claimant offered prices for some types the products, not all the quotations. The cost

prices of the Claimant's products cannot be proved. Most parts of the Emails are their own statements without being confirmed by the Claimant. So, this evidence could not prove Respondent's claims. Evidence 4-4, it can show that it was the Claimant to ask for the product and price. Firstly, it is clearly an offer but the Respondent did not give a promise immediately or in a reasonable period. Therefore, the agreement is not established per Articles 22, 23, 25, 26 of the "Contract Law". Secondly, the four kinds of specifications of the product are not of the product mentioned in the Agreement. Thirdly, the prices for these four kinds of CTC product are only limited in 2011, not the final prices. At last, CTC did not accept the price. Therefore, even if the Respondent promised to accept the goods, they also need to meet the following conditions. Firstly, the product only contains these four kinds of specifications listed in the email. Secondly, CTC needs to agree the Claimant's quotation. Thirdly, the Claimant exported product to CTC. But in fact, the Claimant did not reach an agreement with CTC or export product to CTC. So, the Respondent has no legal or factual basis to ask the Claimant to distribute profit based on the 8% for all export volume. The Respondent, per his evidence 4-4 listed in the product offer of four specifications, expands its range to Claimant's every export product, and there is no evidence that both the parties had previously had any intention, which apparently is the Respondent's personal conjecture. As mentioned above, the Respondent has never provided the Claimant with specifications and the purchase order of so-called "mobile housing" and "mobile shelter" and other products, let alone made any contribution to the production. So, the product does not lie within the scope of the Distribution Agreement. And then the Respondent asking for the profit is clearly unfounded. Per the Respondent's evidence 4-4 listed in the product offer of four specifications, the agreement is not established, and the four involved specifications of the product did not export. Therefore, the Claimant has no right to claim profits. The Claimant has been at a loss since the sign of the Distribution Agreement. So, there's no profit can be allocated.

In view of the above, the Respondent's point of view: 1) The product quality problem claimed by the Respondent is mainly upon the ice hockey goals, and the profit distribution is mainly on the shelters and canopies. The Claimant's statement that the staff of the Respondent was in field and there should be no quality problem when the products reach the final customer is false. First, according to the two of the Respondent's staff, the communication between the Claimant and them was only in the aspect of technical instruction, the Claimant repelled them in other aspects. They cannot cover the quality and shipment of the Claimant at all. Second, the qualified state of the products in delivery cannot eliminate the quality problem in the course of using of the products, and the product quality responsibility cannot be exempted. 2) As to the cross-examination

opinions of 4-1, The sales amounts of shelter and canopy are all provided by the Claimant's clients, CTC and CPI which are objective, authentic and effective; meanwhile, the Claimant did not provide any adverse evidence to object, so 4-1 evidence should be recognized and accepted.; As to the cross-examination opinions of 4-2, Page 736 email and the attachment prove that new products are still ordered after May of 2013 by the Respondent from the Claimant and all the relevant emails were sent or copied to the Claimant, so all these orders are notified to and known by the Claimant; As to the cross-examination opinions of 4-3, The relevant cost and quote information provided are all the information which the Respondent knew about the quote of the products; As to the cross-examination opinions of 4-4, Page 768 email was sent by Jenny actively to Brian in which Jenny offered the quote and profit distribution of the products and the content of email is the true and effective expression of the Claimant's intention; also the commitment of 8% profit to be distributed to the Respondent is not an invitation. Additionally, whether CTC will accept the quote in the email cannot effect the Claimant's commitment of profit distribution to the Respondent. In the mean time, Page 768 email was sent by Jenny actively to Brian in which Jenny offered the quote and profit distribution of the products and the content of email is the true and effective expression of the Claimant's intention which proves that committed profit proportion to be distributed to the Respondent by the Claimant is 8%. The Claimant has no grounds for its statement that "the Claimant has been in the status of losses since execution of the exclusive Distribution Agreement with the Respondent and has no profit to distribute". Firstly, the annual report and other relevant forms provided by the Claimant have no relevance with the case. According to the audited reports of the Claimant, JJ also has constructions in process, bank loans and many payables and receivables among many international and domestic companies besides its daily operations, of which all these are not relevant with the case. Oppositely, the sales of the products which are improved by the Respondent have increased sharply annually and the Claimant has gained a very significant profit. It's obvious from the customs report that the Claimant's sales of shelters during year 2010 to 2015 increased sharply year by year.

5-1 Email correspondence, Page 769-775. To prove: Claimant attended a Show in US independently for marketing without the acknowledging the Respondent which violated Item 1, Article 3.3 of the Agreement; 5-2 US trademark website shot, Page 776-782. To prove: Claimant applied for the trademark "Weather Fast" for its products in US and Canada without notifying Respondent, which violated 3.3 of the Agreement; 5-3 CTC online products shot CTC,Page783-788. To prove: Claimant sold 18×20, 9×10,8×8 and 6×6 shelters to CTC without acknowledging the Respondent which violated the Agreement. For the 8×8 and 6×6 products, the provisions of exclusive agency in the

Agreement are violated, and the Claimant should bear the responsibility of breach to the Respondent. There shall be propaganda photos of the product when you open the details of the product. All the photos were taken by the Respondent due to requirement of the Claimant for propaganda and sales of the product. Thus, it can be determined that the product in the evidence is produced by the Claimant.

The Claimant's viewpoints: 1) The Respondent is a foreign enterprise. All the evidence submitted by the Respondent is originated from a foreign country. These evidences should be notarized and certified before it can be effective evidence in China. However, the Respondent did not notarize or certify the evidence, as a result, these evidence should not be accepted in the arbitration tribunal in China. 2) Through comparison between the evidence submitted by the Respondent during arbitration hearing and the evidence they submitted before the time limit for adducing evidence, the 2 sets of evidence cannot match. The evidences submitted by the Respondent are all beyond the time limit for adducing evidence, as a result, the Respondent should bear the liability of failure of adducing evidence. 3) All the pieces of evidence submitted by the Respondent are photocopies, without any originals to support. So the authenticity of the evidence is not affirmed. 4) The Respondent failed to display originals of the email evidence during arbitration hearing, so the authenticity of these emails evidence cannot be affirmed. 5) From the contents of the evidence we can see that Respondent's claims are based on the unilateral statement of itself. The Claimant had never confirmed any facts claimed by the Respondent. If the Respondent's statement that the customer complained of the product quality and there is loss to the Respondent were true, the Respondent should have provided evidence to prove that the Respondent had made compensation to the customer or there had been legal dispute between the Respondent and the customer, there should be overseas legal documents to confirm the product quality problem and the duty of compensation, however, the Respondent has not provided any relevant evidence. 6) The Respondent refused to admit that it had received the goods during the first hearing. However, it submitted evidence to attempt to prove the "quality problems" of the goods, and the "service" it provided for the goods in this hearing. The Respondent's arguments and evidence are self-contradictory, which reveals that the Respondent has no integrity and credibility, and all of its arguments and evidence are for the only purpose of not paying for the goods. 7) The evidence submitted by the Respondent to prove quality problem is in the form of photos. The products in the photos cannot be proved to be the products produced and delivered by the Claimant. The photos cannot prove that there were quality problems in the products at the time of leaving the factory or after being used by the Respondent. 8) For the Evidence 5-1, it is an email transmitted from the Respondent to the Respondent's attorney, whether the email is revised or not in the course of

transmission is unknown. Furthermore, the fact that the Claimant taking part in a show in the United States cannot be seen from the three photos attached in the email. Even so, if the Claimant took part in the show, no provision in the Agreement by both the parties would be violated. It is groundless for the Respondent to think that the Claimant violated the Agreement. For Evidence 5-2, the authenticity is not confirmed, and the duplicated document was formed outside China. The fact that the Claimant applied overseas trademark cannot be seen from the contents of the evidence, the fact that type of commodity with the registered trademark be the product in this case cannot be seen either. Even if the Claimant applied the registration of trademark overseas, no provision in the Agreement by both the parties was violated. For Evidence 5-3, the authenticity is not confirmed, it cannot be seen from the printed document of the website that the product shown has been produced and sold by the Claimant, and the Claimant has provided evidence to prove that even if there is any product delivered to CTC, it shall be under the definite instruction of the Respondent. The Claimant is not the only supplier so even if CanadianTire sold 18 x 20 shelter, he still can purchase goods from other company. Thus, the evidence was not relevant to the case. There is no basis for the Respondent claiming liquidated damages, and there is no evidence to prove any loss. First, in the case, the Respondent did not have any actual loss. As mentioned before, the Respondent has obtained a huge amount of profits and other illegal benefits under the protection of legal coat of the Agreement. And the Respondent cannot prove his loss in the performance of the Agreement. Second, Per Chinese Contract Law, the liquidated damages claimed by the Respondent are too high, which shall not be higher than 30% of the actual loss. Third, the Arbitral Tribunal shall take full consideration of the Respondent's malicious deed and nonperformance while signing and carrying out the Agreement, and dismiss the Respondent's motion. 9) Moreover, altogether 21 items and 776 pages submitted by the Respondent are all printed documents of emails. The Respondent has neither provided the notified and certified copies, nor shown the original copies of the evidence during the hearing. The Claimant hereby asks the Arbitration Tribunal not to admit the evidence according to the Arbitration Law and Rules of Evidence in China.

In view of the above, the point of view of the Respondent: 1) For the email in Evidence 5-1, the Respondent has the original email and will submit it to the Tribunal for examination. The Claimant took part in the show in the United State to make advertisement and marketing of the products without acknowledging the Respondent in 2012, according to the Agreement, the Respondent is an exclusive agent all over the world, the Claimant should not sell or market the product all over the world except through the Respondent. In the Evidence 3-7 above, it is mentioned that

the Respondent helped the Claimant to solve a patent dispute in the United States. Actually, the patent dispute happened when the Claimant took part in the show in the United States without notifying the Respondent and traded with the American customer SHELTERLOGIC. When the Claimant involved in the patent dispute, the Claimant asked help from the Respondent and told the Respondent about the dispute and the photos of taking part in the show, and only at that time did the Respondent get to know the event that the Claimant took part in the show. Jenny has explicitly pointed in page 769 emails to Brian that the pictures attached are the booth picture. Both 5-1 evidence and 3-7 evidence jointly prove that the Claimant attended a Show in US independently and turned to the Respondent for help with respect to that the Claimant was found and questioned by Shelterlogic at the show for a patent infringement issue. Obviously, the Claimant violated the clause 3.3(1) of the Distribution Agreement, so the Claimant should be liable for breach and pay one million US dollars. 2) For Evidence 5-2, the trademark WEATHER FAST was applied by the Claimant in USPO on October 17, 2013, which is the date after both the parties signing the Agreement, i.e., during the normal cooperation term of both the parties. Therefore, the action of the Claimant violated the agreement of exclusive agency in 3.3 of the Agreement. It can be seen from the Trademark Application Document that the trademark covers "CANOPIES ; CANOPIES FOR MOUNTARNEERING OR CAMPING", and the product in the case is covered in the scope above. Website shots in 5-2 evidence are authentic and effective. 3) 5-3 website shots are authentic and effective and the pictures of the products on sale are all taken and provided by the Respondent, so it can be confirmed that the products on sale are those which are improved upon the Respondent's suggestions and technical support and produced by the Claimant and sold to the CTC without the knowledge of the Respondent. The Claimant severely violated the clause 3.3(i) of the Distribution Agreement by selling the improved products to customers without notifying the Respondent, so the Claimant should be liable for breach and pay one million US dollars. 4) For the Claimant's Opinion on profit distribution proportion, the Respondent's point of view: ①The Claimant confuses the "liquidated damages" and "compensations for damages". The premise of the liquidated damages is the breach of contract instead of losses. In this case, both parties reached an agreement on the liquidated damages in the Distribution Agreement, namely as long as the Claimant violates the clause with respect to the Claimant's exclusive distribution right, the Claimant should pay liquidated damages in amount of US$1,000,000 to the Respondent. ②The liquated damages claimed by the Respondent are absolutely not too high. Firstly, the amount of liquidated damages is explicitly agreed by both parties in advance comprehensively in consideration of factors like the product improving technology provided by the Respondent, the previous annually exporting

amount, etc. Secondly, the actual losses caused to the Respondent by the breach of the Claimant are too huge and far exceed the amount of liquidated damages. The actual losses of the Respondent not only include the profits which the Respondent should have received but not actually received from the Claimant since the execution of the Distribution Agreement, but also include the value of series of product improving technologies provided to the Claimant free of charge.

3 Evidence obtained by the Arbitration Tribunal

The written and stamped material *Information of Export Customs Declaration Numbers, Trading Countries, Quantity and Amounts, etc. of shelters (commodity code: 94060000) and canopies (commodity code: 63062200) Exported by Rizhao J&J Manufacturing Co. Ltd (J&J) between January 20, 2010 and July 31, 2015* (42 pages) provided by Qingdao Customs of PRC when the Tribunal went to Qingdao Customs for it, was cross examined by both the parties under organization of the Tribunal during the hearing.

In view of the written material, the Claimant's point of view: 1) The description of all commodities in the Customs Data Table is "movable house". The Customs have not provided data of "mobile shelter" as applied by the Respondent in the Application of Evidence. Therefore, the data do not have the accuracy, legality and relevance, cannot be used as the proof of facts in this case. According to the *Import & Export Tariff of Customs of the People's Republic of China* (2016 edition), the commodity of HS code 9406000090 refers to "other movable houses", and the HS code of "movable houses" provided by the Customs is "9406", obviously, the data provided by the Customs is not accurate, and the legality and relevance of evidence is lost. 2) Neither the "movable house" in the data of the Customs nor the "mobile shelter" applied by the Respondent in the application is the "product" agreed by both the parties in the Distribution Agreement. The Respondent never provided any specification to the Claimant or made any purchase from the Claimant. They are not in accordance with the definition of "product in 2.4 and 2.5 in the Distribution Agreement; The Respondent claimed that the "movable shelter was reformed and upgraded by himself, but there is no evidence to prove it, on the contrary, the Claimant has evidence to prove that the product was developed and manufactured by himself, and has no relationship with the Respondent. There is no contract basis for the Respondent to claim for the profit and require the Claimant to undertake the responsibility of breach. The Claimant prepared corresponding customs declaration on the basis of the list provided by the Customs, on which the imported goods are: movable houses for animals (pet cages), garden sheds, and not all of them are mobile shelters. In the evidence of the Claimant, the models of the mobile shelters are 42211 and 92942. The models of mobile shelters exported by the Claimant are different from

each other, and all of them were developed by the Claimant, different from the product claimed by the Respondent as having provided specifications for them. The Respondent provided a set of e-mails between the Claimant and the Respondent, the Respondent provided specifications for the product of mobile shelter, and the mobile shelter with the specifications of 10×10×8,19384878 was purchased by the Respondent from the Claimant, and the shelter shall be sold only to the Respondent, thus, the mobile shelter with the specifications of 10×10×8,19384878 can be regarded as the product under the Contract; In evidence provided by the Claimant, there are 16 models of mobile shelters produced and exported by the Claimant. The mobile shelters other than the model above were not designed, reformed or upgraded by the Respondent, and the Respondent has no evidence to prove it. The shelters of other models are not under the Contract, and the Claimant has the right to export them by himself.

In view of the written material, the Respondent's point of view: 1) The material provided by the Customs is the export information of mobile shelters and shelters exported by the Claimant Rizhao J&J Manufacturing Co., Ltd. from January 20, 2010 to July 31, 2015, including the description of exported commodity, quantity of export, trading state and total amount of export. In the Distribution Agreement (hereinafter as "Contract") signed between the Claimant and the Respondent on January 20, 2010, it is clearly stated in 9.1 that the period of the Contract is 20 years; The Claimant's export and sales shown in the material provided by the Customs all took place within the period of Contract between the Claimant and the Respondent. 2) According to provisions in 2.4 of the Contract, the "product" in the Contract refers to all the sports products, outdoor products, outdoor shelter products and gym equipment, etc. The product includes two types: one is all the products manufactured or produced by the Claimant with the product specification provided by the Respondent, the other is all the products manufactured or produced by the Claimant according to requirements of customers. It is stated in 1.4 of the Contract: ......The order must be through the Distributor (Respondent) if the one of the following happens: name a product, make customer service for products sold to U.S.A., Canada or other countries, new product (e.g. upgraded or reformed shelter products), change the label or package, new customer or new department of the present customer or new purchaser, examine or redesign the supplier's (Claimant) infringing products. In this case, the Respondent provided the Claimant the upgrading and reforming measures as well as directions for a series of products agreed in the Contract, including the product specifications, according to agreement of the Contract as well as the market demand and the customer's requirements. The evidence submitted by the Claimant is sufficient to prove the above as follows: ① The Respondent provided new zipper equipment for the Claimant's product of mobile shelter, the production

efficiency was improved, the shelter product is upgraded and reformed. P312-314 of the evidence provided by the Respondent are emails of Brian, the person-in-charge of the Respondent, ordering zipper equipment from the supplier in U.S. P324-327 of the evidence are emails in June 2011, the Claimant ordering again sewing machine as well as parts and component from the Respondent. In P324, the email sent to the Respondent by the Claimant, the Claimant expressed clearly that the working efficiency of the two new zipper sewing machines was obviously higher than the old one, and the quality of the product was also improved; Therefore the Claimant wanted to buy two more machines and provided the model of the machines they needed. ② The Respondent made reform for a series of products of mobile shelters with the model of 37-1398 sold to CTC and explained the reason of reform in detail, so that the products of the Claimant were reformed and upgraded. In P408-414 of the evidence, the emails prove that, in June 2010, when Brian of the Respondent gave the revision scheme of the product, the legal representative of the Claimant, Zhang Yan (Jenny) asked the Respondent to explain the specific advantages of the revision scheme; In P417-421 of the evidence, the emails, Brian, the person-in-charge of the Respondent explained the product improvement scheme one by one for the Claimant, e.g., Lowering the position of the measurement tube is to make the snow easy to fall; Changing plastic mat into the directly welded steel can make the product be more stable; Increasing the four supports can make the tarpaulin and door reach the bottom of the shelter frame, so as to better resist the wind and snow. In P434, in July 6, 2016, the email sent by the legal representative of the Claimant, Zhang Yan (Jenny) to Brian, the person-in-charge of the Respondent, it is confirmed that the customer CTC company completely accepted all the improvement measures given by the Respondent, and would begin to produce the reformed new product from the middle autumn day of 2010. In the mean time, the Claimant asked the Respondent to help to revise the user's manual of the product and design the color box. ③ In P454, the email answered by Brian of the Respondent to Jenny of the Claimant as well as the attachment of the email, the Respondent made the specific revision on the user's manual of the mobile shelter with the model of 37-1398. In the mean time, Brian of the Respondent took the pictures of the product himself and provided them to the Claimant for making the manual. Also, in the evidence submitted by Brian, the emails between Brian and Jenny in P457 are sufficient to prove it. The Respondent helped the Claimant to improve the package of the mobile shelter produced for the customer CTC company, took pictures for the outside package, revised and perfected the user's manuals for the 37-1107 canopy and 37-1112 mobile shelter. In P520 of the evidence, email in January 2011, the legal representative of the Claimant, Jenny, requested Brian, the person-in-charge of the Respondent to help improve the package and revise the user's manual; In P523 of the evidence, email,

the legal representative of the Claimant, Jenny, requested Brian, the person-in-charge of the Respondent to take pictures of the outside package and design of the mobile shelter; In P530-534, email proves that the Claimant used the pictures taken and provided by the Respondent as replacement in the manual for mobile shelters. In P549 of the evidence, the legal representative of the Claimant, Jenny, requested Brian, the person-in-charge of the Respondent, to revise the original user's manual of the 10x20 canopy. The email in P558 proves that the Claimant accepted the improvement suggestion given by the Respondent and would make production accord to the suggestion. ④ The Respondent helped the Claimant improve the package technology of $10 \times 10 \times 8$ mobile shelters with the model of 1934878. In P652-667 of the evidence, emails, in May 2013, Lv, one of the Claimant's staff, asked King, one of the Respondent's staff, for the package of mobile shelter, and King provided specific solution scheme. In P660-661, the emails between Lv and King clearly shows that King gave detailed answering to the questions raised by the Claimant, solve such problems in package as being too much space at the bottom of the carton, too much space for the steel pipe and failure in box dropping test. In the mean time, King, as staff of the Respondent, was assigned to the Claimant's factory in Rizhao to give technical assistance in field. ⑤ The Respondent met persons from the Claimant's customer CTC company, and helped CTC to make installation of products in field and technical consultation after sale. In P506-507 of the evidence, Richard and John from CTC communicated with Brian of the Respondent, hoping Brian to help install the mobile shelter with the model of #1399; In P508, the email sent by Brian to Christina of CTC, Brian gave detailed improvement suggestion on the product, including thickness of the steel pipe and specifications of PE. The Respondent helping the Claimant's American customer to deal with package and giving specific consultation are exactly the specific reflection of "Set up customer service for the product sold in USA, Canada and/or other countries."⑥ The Respondent helped the Claimant to solve the patent dispute with his customer Shelter Logic. In P637 of the evidence, Jenny, the legal representative of the Claimant sent email to Brian of the Respondent, to ask for help of disposition of the infringement case of package for mobile shelters, the case was filed by an American customer. In fact, in earlier time, as shown in P601 of the evidence, the email between Jenny and Brian, the Respondent already warned the Claimant that the product may infringe patent right. In P646 of the evidence, email, it is shown that Brian helped the Claimant dispose the case properly through communication with lawyer, etc. The evidence above can prove that, after signing the Contract, the Respondent provided a series of technical support and improvement measures for mobile shelters and canopies for the Claimant. They not only made the products meet the requirements of local customers, but also improved the quality of the two series of products, increased the security

of the product, durability of the pipes and wind resistance. The actions and measures taken by the Respondent were for the product in 2.4 and 1.4 in the Contract between both the parties. Such facts as time of signing the Contract by both the parties, the period of existence of the Contract relation, the time of export of the Claimant's products, the technical directions provided for the Claimant by the Respondent on production and package of mobile shelters are comprehensively sufficient to prove that the large number of mobile shelters and canopies (The translations are different: they are called movable houses in the Customs information) exported by the Claimant from January 20, 2010 to July 31, 2015 according to the material obtained by the Arbitration Tribunal from the Customs are the products agreed in the Distribution Agreement. Moreover, as shown in P704-705 of the evidence provided before by the Respondent, in the picture taken on July 10, 2015 from the official website of CTC, the Claimant's customer, the mobile shelter on sale is the product improved by the Respondent, and the picture of the mobile shelter shown in it was provided by Brian himself. Thus, it can also prove that the mobile shelters and canopies exported and sold by the Claimant are products improved by the Respondent. 3) According to the material obtained from the Customs, the Claimant had been exporting goods continuously to many countries including USA, Canada, Finland, Sweden, Norway, Panama, Australia, Denmark, Japan, Philippine and Russia. However, except some of the products exported to USA and Canada, the export and sales of mobile shelter (movable house) by the Claimant to the countries above have not been reported to the Respondent or gone through the Respondent, and the Respondent knows nothing about them. According to 3.1, 3.2 and 3.3 of the Contract, the Respondent has the exclusive right to distribute products globally, i.e., within the period of the Contract, the Claimant should not directly or indirectly get around the Distributor (Respondent) to sell, distribute, market or lease the product in the world, or manage to make the product available in the market. The Claimant did not inform the Respondent, however, the Claimant sold the products without authorization in USA, Canada, Australia, Japan and Russia, etc., seriously breached the agreement of exclusive distribution in the Contract. According to Article 12 of the Contract, the Claimant should pay the liquidated damages of USD one million due to the serious breach of the agreement of exclusive distribution in the Contract. 4) The material obtained from the Customs shows the total sales amount of mobile shelters and canopies exported by the Claimant from January 20, 2010 to July 31, 2015. In P768 of the evidence, the email is about distribution of profits from sales of mobile shelters between the Claimant and the Respondent. On October 27, 2010, the legal representative of the Claimant, Jenny, promised to Brian through email that the profit of the $12 \times 20 \times 8$ mobile shelters shall be 8% of the sales amount. It can also be enough to prove that the series of improvement and upgrading of the mobile shelters

as in Article 2 of the Contract had been completely accepted by the Claimant, otherwise, the Claimant would not have given written confirmation on distribution of profit. 5) According to 1.4 in P1 and P2 of the Contract, new orders from old customers can go through the Claimant, but the profit shall be equally divided. The average profit rate in the industry of mobile shelters and canopies is 12%, i.e., the profit rate of 6% can be claimed by the Respondent. In the mean time, the 8% profit above promised by the Claimant was only for the 12×20×8 mobile shelters. Therefore, the Respondent hereby claims that the profit shall be distributed at the rate of 6%. 6) The export sales amount shown in the Customs data for the Claimant in the period above is much bigger than the sales data obtained by the Respondent at the time of submitting the counterclaim application. In P706-735 of the Respondent's evidence, the sales amounts of mobile shelters and canopies sold by the Claimant to CTC and CPI in 2011, 2012 and 2013 were USD2704662.72, USD4703906.8 and USD9522279.7, however, the export sales amounts in the three years shown in the Customs data are much more than the amounts above. Hence, the Respondent reserves the right to file a separate case for arbitration, claiming for distribution of profits. Overall, the evidence materials obtained from the Customs are authentic, objective and relevant to the case, completely strongly prove the counterclaim of the Respondent. There is serious breach of Contract by the Claimant, the agreement of exclusive distribution is violated, the Claimant should pay liquidated damages of USD one million to the Respondent, and the Claimant should pay the Respondent the profit which should be distributed. 7) The information provided by Qingdao Customs of movable houses exported by the Claimant from January 20, 2010 to July 31, 2015 is completely correct, objective and reflects the export of "mobile shelters" of the Claimant. First, according to the result of the HS code found from the website of the Customs Head Office of the People's Republic of China, there are three types of commodities under "94060000": 9406000010 refers to the movable houses made of animal or plant materials; 9406000020 refers to the HEPA closed clean house with air fan; 9406000090 refers to other movable houses. According to the business scope and the information provided by the Claimant of the customs declaration of export goods in P387-1085, it can be confirmed that the Claimant has never carried out the production of commodities with HS codes of 9406000010 and 9406000020. Hence, the export commodity under the HS code of 94060000 is actually the export commodity of other movable houses with the HS code of 9406000090. Second, the commodities under the HS code of 9406000090 includes mobile shelters, movable houses for animals, pet cages, horse face covers and rabbit cages. However, according to the business scope of the Claimant and the customs declaration information provided by the Claimant of the export goods in P387-1085, the commodities exported by

the Claimant under the HS code of 94060000 were all mobile shelters, and the export amount was much more than the sales amount obtained by the Respondent at the time of submitting the counterclaim. Therefore, the export data report provided by the Customs has completely reflected the export and sales of mobile shelters and canopies during the period from January 20, 2010 to July 31, 2015, should be accepted and used as evidence of the case.

IV Facts in the Case

The facts found out by the Tribunal:

1 On January 20, 2010, the Claimant signed the Distribution Agreement with the Respondent. It is agreed in Clause 1.2, the Supplier (Claimant, hereinafter the same) is interested in manufacturing the Product and desires to have any and all Product exclusively distributed by Distributor (Respondent, hereinafter the same) all over the world; Clause 1.3 The Distributor desires to exclusively distribute Product all over the world; Clause 1.4 When the Distributor makes certain change to the supplier's organization, new orders from new customers will go through the Distributor. New orders from buying divisions of the old customers will go through suppliers but the profit will be split. New products (sku) from new or old customers will go through the Distributor. When the below listed situations happen: the orders related shall go through the Distributor; Clause 1.4.1 Brands the product, Clause 1.4.2 Sets up customer service for the product in the sold in USA, Canada and or other countries, Clause 1.4.3 New products or improve or upgrade old products Examples upgraded shelter product line, Clause 1.4.4 Changes labeling or packaging, Clause 1.4.5 New customers or divisions or new buyers of a current customer, Clause 1.4.6 Review and redesign the products the suppliers is infringing, Clause 1.6 The Distributor will make available for protection all the patents old and new that the distributor has or does in the future while the agreement in affect if these patented product are product by the supplier for the distributor; It is agreed in Clause 2.4, "Product" shall mean any and all sports products, outdoor products, outdoor shelters, fitness equipment, trampolines and electronic products, and any other products the Distributor introduces or sells, manufactured by the SUPPLIER in accordance with the Product Specifications and any part or component thereof, whether replacement or not; Clause 2.5 "Product Specifications" shall mean the specifications relating to the manufacturing of product in sample and bulk form reasonably established by DISTRIBUTOR and/or required by the Customer, as may be modified from time to time by; Clause 3.1 DISTRIBUTOR shall have exclusive right to distribute the product all over the world; Clause 3.2 SUPPLIER shall have the right to distribute the product by itself in all other countries excluding North America with written approval from the Distributor. The supplier shall not appoint any third party as his distributor and agent of the Product without written approval from the Distributor; Clause 3.3 During the term of this agreement,

the SUPPLIER (including its directors, owners, officers, subsidiaries, associate companies or undertakings) shall not directly or indirectly: (i) sell, distribute, market, lease or otherwise make available the Product all over the world except through the DISTRIBUTOR; or (ii) Grant a license, franchise or any right to anyone other than the DISTRIBUTOR for the sale, distribution, marketing, leasing, production and manufacturing of the product all over the world; Clause 4.1 The relationship between SUPPLIER and DISTRIBUTOR is that of seller and buyer; Clause 4.2 Nothing in this Agreement shall be construed or deemed to make any party hereto joint ventures or to constitute that either party hereto is an agent or employee of the other; Clause 7.2 SUPPLIER warrants that all products shall have been manufactured in compliance with good manufacturing practices, and comply with all effective at that time laws and regulations and/or mandatory requirements on Product; Clause 7.3 SUPPLIER will defend, indemnify and hold DISTRIBUTOR harmless from and against any and all suits, actions, claims, judgments, debts, obligations or rights of action of any nature or description arising from product liability and defects with respect to the Product produced by SUPPLIER, and all reasonable costs, including attorneys' fees, incurred by DISTRIBUTOR; Clause 7.4 DISTRIBUTOR shall defend, indemnify and hold SUPPLIER harmless from and against any and all suits, actions, claims, judgments, debts, obligations or rights of actions of any nature or description arising from product liability caused by any Drawing that DISTRIBUTOR submits to SUPPLIER have confirmed samples and are approved solely by DISTRIBUTOR in writing, subject to compliance of Product with all the drawings, specifications supplied by the DISTRIBUTOR; Clause 7.5 Both parties hereto shall be jointly responsible for any and all suits, actions, claims, judgments, debts, obligations or rights of action of any nature or description arising from product liability caused by any Drawing that DISTRIBUTOR submits to SUPPLIER and have confirmed samples, and that are approved by both parties in writing subject to compliance of Product with all the drawings and specifications; Clause 8.1 At its sole cost and expense, SUPPLIER shall cause rejected Nonconforming Units to conform to DISTRIBUTOR's specifications. In the event the products units rejected are not made to conform to DISTRIBUTOR's satisfaction and if DISTRIBUTOR has paid for such Products, then DISTRIBUTOR shall promptly grant DISTRIBUTOR an account credit or refund at DISTRIBUTOR's option, for all Nonconforming Units rejected by DISTRIBUTOR; Clause 8.2 DISTRIBUTOR shall have reasonable access to the facilities of SUPPLIER used for the production of DISTRIBUTOR's Products; Clause 9.1 The term of this Agreement shall be for twenty (20) years, commencing January 20, 2010, ending on January 20, 2030, and automatically continuing thereafter for successive one year terms, unless either party gives notice of cancellation to the other at least Sixty (60)days in advance of the anniversary renewal date, or sooner terminated as a result

of a material breach by either party; Clause 9.2 During the term of this Agreement and within three(3)years after termination of this Agreement if the agreement is breached by supplier, SUPPLIER agrees that it shall refrain from communicating whatsoever and/or setting up business relationship with Customer directly or indirectly, and further agrees that in the event that any Customer contacts SUPPLIER to purchase the Product, SUPPLIER shall promptly forward said communication to DISTRIBUTOR in writing, whether said communication is by e-mail, facsimile, mail or otherwise; The Distributor will have and increase 10% a year for the first 2 years; Clause 10 BREACH OF CONTRACT, SUPPLIER will pay to DISTRIBUTOR one million US dollars (USD1,000,000.00) as liquidated damages for breach of Clause 3, Clause 4, Clause5, Clause 6, Clause 7, Clause 8 and Clause 9.2 of this Agreement by SUPPLIER. Distributor will pay to supplier one million US dollars(USD1000, 000.00), as liquidated damages for breach of Clause 3, Clause 4, Clause 5, Clause 6, Clause 7, Clause 8 and Clause 9.2 of this Agreement by Distributor.; Clause 11.3 This Agreement shall be governed, construed, and interpreted under the laws of the People's Republic of China, excluding rules of conflicts of law; Clause 11.4 All disputes arising from or in connection with this Agreement if possible be settled amicably through friendly negotiation. In case no settlement can be reached, either party may require the Qingdao Arbitration Commission to settle the dispute in accordance with its currently valid arbitral rules. The arbitration shall take place in Qingdao, and the language to be used in the arbitral proceedings shall be English; Clause 11.5 The official language of this Agreement is English and all notices, reports, orders, instructions, literature, records and other written materials pertaining to this Agreement will be maintained and delivered in English; Clause 11.7 In the event that one or more of the provisions in this Agreement shall, for any reason, be held by a court or arbitration tribunal of competent jurisdiction to be invalid, void or unenforceable in any respect, such holing shall not affect any other provisions of this Agreement; Clause 11.8 The failure of either party to insist, in one or more instances, upon strict performance of the obligations of this Agreement, or to exercise any right contained herein shall not be construed as a waiver, or relinquishment for the future, of such obligation or right, which shall remain and continue in full force and effect. It is agreed in the Addendum A that, if the annual sales is less than USD10,000, 000.00, the supplier will have 8% profits before taxes; If the annual sales is between USD10,000,000.00 to 20,000,000, the supplier will have 6% profits before taxes; If the annual sales is more than USD20,000,000.00, the supplier will have 5% profits before taxes.

2 The Claimant issued 28 commercial invoices to the Respondent and LASCANOPYARVIK OY respectively on August 22, August 26, August 28, September 9 (2 invoices), September 10, September 13, September 16, September 18, September 22, September 23, September 26, September 30,

October 8 (2 invoices), October 10, October 11, October 14, October 18, October 21, October 25, October 28, October 30, November 4, November 11 (2 invoices), November 14, November 21, 2013, and the total amount of goods recorded on the invoices is USD1278496.82. The Claimant made export customs declaration for the 28 shipments of goods in 32 times to the Rizhao Customs of P.R. China and Qingdao Huangdao Customs. It is recorded on the Export Customs Declaration Forms of the People's Republic of China that the total FOB value of the 28 shipments of goods is USD1286758.50. The B/Ls corresponding to the commercial invoices issued by the Claimant proves that the consignees on the 28 B/Ls for the 28 shipments of goods are the Respondent, COSTCO WHOLESALE CANADA LTD and LASCANOPYARVIKE OY respectively.

3 Jenny Zhang, one of the Claimant's working staff, sent emails to Brian Goldwitz, the legal representative of the Respondent on December 23, 2013, January 6 and January 7, 2014, requiring the Respondent to pay the delayed payment for goods, but without any answer from the Respondent.

4 The Claimant sent the Notice of Avoidance of Contract to the Respondent through TNT Express Company on August 7, 2015. Since the Respondent refused to pay the USD1270000.00 for the goods between March 28, 2013 and May 3, 2013, according to Clause 9.1 of the Distribution Agreement, the Claimant noticed the Respondent to avoid the Distribution Agreement, and required the Respondent to pay all the USD1270000.00 and the interest USD117699.00 to the Claimant within 5 days after the Claimant mailed the Notice. The Respondent received the Notice of Dissolution of Contract on August 18, 2015.

5 The Respondent received 71 times of complaints on the quality of ice hockey goals produced by the Claimant, among which 70 was complaining the quality of net on the ice hockey goals. The Respondent received three complaints from the clients on the quality of net of ice hockey goals produced by the Claimant on September 7, 2012, May 7, 2013 and June 5, 2013.

6 Between September 20, 2010 and December 28, 2013, the Respondent sent to the Claimant 24 emails to require the Claimant to improve the technology and quality of the ice hockey goals and avoid complaints from clients, among which required the Claimant to pay attention to the aging of the goal net 2 times and required to solve the quality problems in package and iron pipes in the ice hockey goals, etc. The Claimant confirmed that there is technological and quality problems in some products in the reply emails .

7 On April 15, 2010, April 29, 2010, June 13, 2010 and June 21, 2010, the emails between the legal representative of the Respondent Brian Goldwitz and Mao Jian Jun prove that the Respondent had entrusted Mao Jian Jun to produce the ice hockey goal net. The email between the legal representative of the Respondent Brian Goldwitz and Jenny of the

Claimant on June 21, 2010 proves that the producer of ice hockey goal net made price offer to the Respondent separately, and the Respondent determined the final producer and price of the ice hockey goal net.

8 The Respondent had deducted from the payment that should be given to the Claimant to compensate the loss caused by return of products by the clients due to unqualified products produced by the Claimant in 2010, 2011, 2012 and 2013.

9 From 2010 to 2012, recommended by the Respondent, the Claimant entrusted the Respondent to buy 4 sewing machines and components, the payment for the machines and freight had been deducted from the payment that should be made to the Claimant for the products.

10 In April 2010, the legal representative of the Respondent, Brian Goldwitz, went to Canada to show and install canopies for the Claimant's client CTC. Between June and October, 2010, the Respondent gave suggestion on some words, grammar, typesetting and arrangement of the advertisement to be published on the magazine of Global Source, and revised it.

11 In October 2010, the Claimant made the PPT advertisement materials for describing the products to the client CTC. The Respondent gave suggestions on some words and pictures of it and revised it.

12 In June 2010, the Claimant put forward a revision scheme for the 37-1398 shelters, the Respondent assisted the Claimant to revise it and made the written explanations of the improvement scheme. The scheme was approved by the client CTC. In July 2010, the Respondent assisted the Claimant to make and complete the user's manual for the new products of 37-1398 shelters, which was delivered to CTC.

13 Since the Respondent's legal representative Brian Goldwitz marketed the Respondent's own product of SHELTERIT in the emails between Brian and Christina Boldy of CTC, in October, 2010, Christina Boldy of CTC clearly required the Respondent in his email to the Respondent to copy all the emails between them to the Claimant; In the mean time, CTC reminded the Claimant through email that they had to believe that the Respondent's legal representative Brian Goldwitz was marketing his own product of SHELTERIT, instead of the Respondent's product, to CTC, and the way of doing was not in accordance with the cooperation contents determined by the Claimant and CTC. On October 2010, the Claimant clearly required the Respondent through email that the Respondent must copy all the emails between the Respondent and CTC to the Claimant, should not break the rule and directly contact with Christina Boldy of CTC instead of Shanghai Office of CTC.

14 Between January and May, 2011, the Respondent provided photos and advertisement pictures of 37-1107 and 37-1112 shelters to the Claimant, assisted the Claimant to design and make the user's manuals of the products above, however, there are the Respondent's own brand SHELTERIT and the Respondent's contact number in some photos and

advertisement pictures provided by the Respondent. In the mean time, the Claimant had entrusted a person not involved in the case to perfect and revise the user's manual for 37-1112 shelters.

15 In November 2012, when the Claimant took part in the exhibition in the United States, the Claimant was accused by Shelterlogic Company for infringing its trademark and patent with the exhibited product and pictures. The main pictures were provided by Brain Goldwitz, the legal representative of the Respondent. Hence, the Claimant consulted the Respondent on how to deal with it. The Respondent provided the strategy and method to cope with it, and gave suggestions to the Claimant on improvement of products and avoiding infringement of trademark and patent of others.

16 Between May and June, 2013, the Respondent provided order directions and product specifications of 1934878×8 shelters to the Claimant, and assisted the Claimant to produce the type of products. The products were all sold to the Respondent.

17 In June 2013, the Claimant put forward an improvement scheme of pipe fittings coupling and securing technology for shelters. Brain Goldwitz, the legal representative of the Respondent, gave his own technical analysis opinions and suggestions on the scheme.

18 Between July and August, 2013, the Respondent provided some photos, assisted the Claimant to make and complete the user's directions for 10×20 shelters.

19 On October 27, 2010, the Claimant proposed in the email to the Respondent that the price offer planned to be provided to CTC for the four types of products shall include the 8% of the Respondent.

20 On October 17, 2013, the Claimant applied for trademark registration for "Weather Fast" abroad, the applicable products include the climbing canopy.

21 According to the written material *The Information of Export Customs Declaration Form, Trading Countries, Quantities and Amounts, etc. of Mobile Shelters (HS code: 94060000) and Canopies (HS code: 63062200) Exported between January 20, 2010 and July 31, 2015 by Rizhao J&J Manufacturing Co., Ltd.*, the amount of mobile shelters and synthetic fibre canopies exported by the Claimant to U.S. and Canada from January 20, 2010 to July 31, 2015 is USD34762935.00, the amount of mobile shelters and synthetic fibre canopies exported by the Claimant to Finland, Sweden, Norway, Panama, Australia, Denmark, Japan, Russia, and Ireland from January 20, 2010 to July 31, 2015 is USD3738573.00, and the total amount is USD38501508.00. In the column of "Description of commodity" in the written material issued by Qingdao Customs above, the "movable house" and "Synthetic fibre canopy" were filled, however, the *Customs Declaration Form of Export Goods of the People's Republic of China* provided by the Claimant and corresponding to the written evidence of Qingdao Customs proves that the "movable house" includes

the mobile shelter and movable house for animals, according to Clause 2.4 of the Distribution Agreement, the movable house for animals does not belong to the "Product" agreed in the Distribution Agreement, and the Claimant has the right to sell by itself. In the mean time, there is no specific type of "movable house" in the written material issued by Qingdao Customs, therefore, it cannot be determined whether the mobile shelter in the "movable house" belongs to 37-1398, 37-1107, 37-1112 or 10×20 shelters or not, i.e., whether it belongs to the goods that must go through the order of the Respondent as agreed in Clause 1.4 in the Distribution Agreement. Some *Customs Declaration Forms of Export Goods of the People's Republic of China* provided by the Claimant and corresponding to the written evidence of Qingdao Customs proves that the "movable house" includes movable houses for animals of USD2751228.72, mobile shelters of USD4010070.28 of types other than 37-1398, 37-1107, 37-1112 or 10×20, and mobile shelters of USD14430207.20 with no type. Moreover, according to Item 2, Article 6, Regulations of the People's Republic of China on Inspection Conducted by the Customs, the customs declaration forms, export and import bills, contract and other materials directly related with the import and export business shall be kept on file for three years after the date of release of the imported or exported goods.

22 In 2011, 2012 and 2013, the sales amounts of the Claimant through the Respondent are USD1985406.90, USD1692682.30 and USD1286758.50 respectively, in sum USD4964847.70. The Respondent has not paid any profit before tax for the goods above to the Claimant.

23 The audit report, tax statement, profit and loss statement submitted by the Claimant show that the net profit of the Claimant in 2011-2014 is in deficit.

24 The Claimant was established on January 28, 2002, the industrial and commercial registration information had been changed for three times between July 2006 and July 2016, but the items of change had not involved the Respondent.

The issues in dispute between both the parties:

1) Whether the Distribution Agreement signed between the Claimant and the Respondent on January 20, 2010 is a contract with clause de style, whether there is clause de style which is obviously unfair and increases the obligations of the Claimant and eliminates the rights of the Claimant.

2) Whether the Respondent has received the 28 shipments of goods and their relevant price.

3) Whether the 28 shipments of goods have quality problem. If the answer is yes, each party's respective right and obligation.

4) Whether the prerequisite of the Respondent's exclusive sales right and profit distribution right in the Agreement is based on the changes to the organization structure of the Claimant in the forms

of investment, buying share, joint venture and acquisition, etc. by the Respondent.

5) The definition and scope of "Product" which the Respondent has the exclusive right to distribute all over the world according to Clause 3 of the Distribution Agreement, and whether the Claimant has infringed the Respondent's right stipulated in the Distribution Agreement.

6) Whether the Claimant has infringed the Respondent's right in Clause 1.4 of the Distribution Agreement and breached the Distribution Agreement.

7) Whether the arbitration claims filed by the Claimant and the counter claims filed by the Respondent should be supported or not.

V Opinions of the Tribunal

1 The effectiveness of the Distribution Agreement and whether the Distribution Agreement is a contract with clause de style, whether it is clause de style which is obviously unfair and increases the liabilities of the Claimant and eliminates the rights of the Claimant.

The Distribution Agreement concluded between the Claimant and the Respondent on January 20, 2010 is an agreement that the Respondent shall have exclusive right to distribute some of the products all over the world, and exclusive distribution is a commercial cooperation mode being used widely. In the Distribution Agreement, on the basis of negotiation and agreement of both the parties, the respective rights and obligations of the Claimant and Respondent are agreed specifically, and the responsibility of breach of each party is agreed equally. The clauses in the Distribution Agreement neither increase the obligations of the Claimant nor eliminate the rights of the Claimant, and there is no obviously unfair terms. In the mean time, the Distribution Agreement is not a contract which was prepared in advance by the Respondent for repetitive use or a contract without negotiation with the Claimant in the course of concluding the contract.

It is agreed in Clause 11.3 of the Distribution Agreement, "This Agreement shall be governed, construed, and interpreted under the laws of the People's Republic of China". It is stipulated in Item 2, Article 39 of the Contract Law in China, "Standard terms are contract provisions which were prepared in advance by a party for repeated use, and which are not negotiated with the other party in the course of concluding the contract." Therefore, the Tribunal holds that the Distribution Agreement is legal effective and binding on the both the parties as it is the true intention of both the Claimant and the Respondent, other than a contract with clause de style, and its contents and form do not breach the obligatory regulations in laws on contract effectiveness. Both the parties shall legally have the rights and undertake the obligations stipulated in the Distribution Agreement.

2 Whether the Respondent has received the 28 shipments of goods and

their price

1) Whether the Respondent has received the 28 shipments of goods

The commercial invoices issued by the Claimant and the corresponding B/Ls prove that, between August 22 and November 21, 2013, the Claimant issued 28 commercial invoices to the Respondent, and the total value on the invoices is USD1278496.82; The Customs Declaration Forms of Exported Goods of the People's Republic of China prove that the Claimant made customs declarations of exported goods to the Rizhao Customs or Qingdao Huangdao Customs in 32 times for the 28 shipments of goods, and the FOB price of the 28 shipments of goods in the Customs Declaration Forms of Exported Goods of the People's Republic of China is USD1286758.50. The B/Ls corresponding to the commercial invoices issued by the Claimant prove that the consignees on the 28 B/Ls of the 28 shipments of goods are the Respondent, COSTCO WHOLESALE CANADA LTD and LASCANOPYARVIK OY respectively.

As for whether the Respondent has received the 28 shipments of goods and the scans of invoices, customs declaration forms and B/Ls through emails, after the legal explanation and questioning of the Tribunal, the Respondent answered clearly after checking: Respondent has not completed data files for the detailed quantity of the received goods, especially for the goods which are not shipped to Respondent. Respondent requested the Commission to identify based on relevant evidences with respect to the consignment and delivery claimed by Claimant; The time span of emails sent from Claimant to Respondent is so large, from year of 2011 to 2013. There are such a big volume of emails that Respondent has not found and confirmed the above emails from Claimant. It is agreed in Clause 11.4 in the Distribution Agreement, "All disputes arising from or in connection with this Agreement if possible be settled amicably through friendly negotiation. In case no settlement can be reached, either party may requires the Qingdao Arbitration Commission to settle the disputes in accordance with its currently valid arbitral rules. The arbitration shall take place in Qingdao, and the language to be used in the arbitral proceedings shall be English." It is stipulated in item 2, Article 43 of the Arbitration Rules of the Commission, "Where a party neither admits nor denies the fact stated by the counterparty, or not has a clear and definite response to the inquiry made by the Arbitral Tribunal, the act of the party shall be considered as the admission of the fact." In the mean time, the Respondent stated in the arbitration defense that there is serious quality problem in the products sold to the Respondent by the Claimant, which has led to the client's return of goods sold by the

Respondent, therefore, the Respondent has the right to refuse to pay the goods in accordance with the Distribution Agreement, i.e., the Respondent did not deny in the Defense that it has received the 28 shipments of goods claimed by the Claimant. Hence, the Tribunal holds that the Respondent has received the 28 shipments of goods claimed by the Claimant.

2) The price of the 28 shipments of goods claimed by the Claimant and received by the Respondent

The total value on the 28 commercial invoices issued by the Claimant to the Respondent is USD1278496.82; The Claimant made customs declarations of exported goods to the Rizhao Customs or Qingdao Huangdao Customs in 32 times for the 28 shipments of goods, and the FOB price of the 28 shipments of goods in the Customs Declaration Forms of Exported Goods of the People's Republic of China is USD1286758.50. Since the commercial invoices issued by the Claimant are the fundamental basis for the Respondent to pay for the goods, hence, the Tribunal holds that, as the value on the commercial invoices is different with the value on the customs declaration forms, the value on the commercial invoices, i.e., USD1278496.82 should be regarded as the price of the 28 shipments of goods above.

3 Whether there is quality problem in the 28 shipments of products, When the quality problem appears, the rights and obligations of the Respondent and the Claimant.

1) Whether there is quality problem in the 28 shipments of products

Between August 1, 2011 and October 26, 2011, the Respondent received 71 times of complains from the clients on quality of ice hockey goals produced by the Claimant, among which 70 times of complains were on quality of ice hockey goal nets. Between September 7, 2012 and June 5, 2013, the Respondent received other 3 times of complains from the clients on quality of ice hockey goal nets produced by the Claimant. The emails between the Respondent and Mao Jian Jun on April 15, 2010, April 29, 2010, June 13, 2010 and June 21, 2010 prove that the Respondent had entrusted Mao Jian Jun to produce the ice hockey goal net; Also, the email between the Respondent and the Claimant on June 21, 2010 proves that a producer of the ice hockey goal net offered price to the Respondent for whom to make the final decision on producer and price of the ice hockey goal net. Moreover, between September 20, 2010 and December 28, 2013, the staff sent to the Claimant by the Respondent had required the Claimant 24 times to improve the technology and quality of the ice hockey goals through emails, so as to avoid

complaining from clients, but only twice of them were requiring the Claimant to pay attention to the aging of the ice hockey goal net. Hence, the Tribunal holds that the evidence submitted by the Respondent is not sufficient to prove that the quality problem in the ice hockey goal net was caused by the Claimant.

Between September 20, 2010 and December 28, 2013, the staff sent to the Claimant by the Respondent had required the Claimant 22 times to improve the technology and quality of the ice hockey goals (not including the ice hockey goal net) through emails, so as to avoid complaining from clients, and the Claimant confirmed the technological and quality problems existing in some products in the emails answered. Hence, the Tribunal holds that there is quality flaw in some ice hockey goals (not including the ice hockey goal net) sold to the Respondent by the Claimant.

2) When the quality problem appears, the rights and obligations of the Respondent and the Claimant.

It is agreed in Clause 8.1 of the Distribution Agreement, "At its sole cost and expense, SUPPLIER shall cause rejected Nonconforming Units to conform to DISTRIBUTOR's specifications. In the event the products units rejected are not made to conform to DISTRIBUTOR's satisfaction, and if DISTRIBUTOR has paid for such Products, then DISTRIBUTOR shall promptly grant DISTRIBUTOR an account credit or refund, at DISTRIBUTOR's option, for all Nonconforming Units rejected by DISTRIBUTOR."

The Respondent has not provided evidence to prove that the Respondent had rejected or returned the unqualified products to the Claimant according to Clause 8.1 of the Distribution Agreement. Both the evidence of the Claimant and the Respondent can prove that the Respondent had deduced the loss caused by the client's return of goods due to unqualified products in 2010, 2011, 2012 and 2013 from the payment of goods to the Claimant. Furthermore, after the Claimant required the Respondent several times on December 23, 2013, December 30, 2013, January 6, 2014 and January 7, 2014 to pay the delayed payment of goods through emails, the Respondent has not required the Claimant to compensate the loss with the payment for goods due to the unqualified products produced by the Claimant. Hence, the Tribunal holds that, there is no factual or legal basis for the Respondent to refuse to pay the goods with the reason that there is serious quality problem in the products sold to the Respondent by the Claimant, and that the problem caused huge economic loss to

the Respondent.

4 Whether the prerequisite of the Respondent's exclusive sales right and profit distribution right in the Agreement includes changes to the organization structure of the Claimant in the forms of investment, buying share, joint venture and acquisition, etc. by the Respondent.

It is agreed in Clause 1.4 of the Distribution Agreement, "When the Distributor makes certain change to the supplier's organization, new orders from new customers will go through the Distributor. New orders from old customers buying divisions will go through suppliers but the profit will be split. New products (sku) from new or old customers will go through the Distributor. When the situations listed below happen: the orders related shall go through the Distributor." But the specific contents and mode of change of organization are not agreed in the Distribution Agreement. In the mean time, it is agreed in Clause 4.1 and Clause 4.2 of the Distribution Agreement, "The relationship between Supplier and Distributor is that of seller and buyer.", "Nothing in the Agreement shall be construed or deemed to make any party hereto joint ventures or to constitute that either party hereto is an agent or employee of the other." Moreover, after the Distribution Agreement came into force, both the parties of the Claimant and Respondent have never done negotiation on the specific contents, forms or time of the change to organization, the Claimant has never required the Respondent to make any change to the organization structure in the forms of investment, buying share, joint venture or acquisition. Hence, the Tribunal holds that, the evidence submitted by the Claimant is not sufficient to prove that the prerequisite of the Respondent's exclusive sales right and profit distribution right in the Agreement is to change the organization structure of the Claimant in the forms of investment, buying share, joint venture and acquisition, etc. by the Respondent.

5 The definition and scope of "Product" which the Respondent has the exclusive right to distribute all over the world according to Clause 3 of the Distribution Agreement, and whether the Claimant has violated the right of the Respondent in breach of the agreement in the Distribution Agreement.

1) The definition and scope of "Product" which the Respondent has the exclusive right to distribute all over the world according to Clause 3 of the Distribution Agreement

It is agreed in Clause 3.1 and Clause 3.2 of the Distribution Agreement, "Distributor shall have exclusive right to distribute the Product all over the world." "Supplier shall have the right to distribute the Product by itself in all other countries excluding North America with written approval from the Distributor. The supplier shall not appoint any third party as his distributor and agent of the Product without written approval from the Distributor". It is agreed in Clause 2.4 and Clause 2.5 of the

Distribution Agreement, "Product shall mean any and all sports products, outdoor products, outdoor shelters, fitness equipment, trampolines and electronic products, and any other products the Distributor introduces or sells, manufactured by the Supplier in accordance with the Product Specifications and any part or component thereof, whether replacement or not." "Product Specifications shall mean the specification relating to the manufacturing of Product in sample and bulk form reasonably established by Distributor and/or required by the Customer, as may be modified from time to time by." It can be seen that the Respondent has the exclusive right all over the world only upon those products on which the specifications have been given by the Respondent and produced by the Claimant.

2) Whether the Claimant has violated the Respondent's right of having the exclusive right to distribute "Product" all over the world in breach of the agreement in the Distribution Agreement
In May and June, 2013, the Respondent provided directions and product specifications for 1934878-10×10×8 shelter to the Claimant, assisted the Claimant to produce the type of product, and all the products of that type were sold to the Respondent. There is no evidence to prove that the Respondent have ever given other specifications to let the Claimant produce products. The Respondent assisting the Claimant to revise, design and make user's manual for some products as shelters and giving suggestions on the improvement scheme of pipeline fittings coupling and securing technology for shelters do not belong to the agreement in Clause 2.5 of the Distribution Agreement. Hence, the Tribunal holds, the evidence provided by the Respondent is not sufficient to prove that there is product as agreed in Clause 2.4 and Clause 2.5 of the Distribution Agreement other than 1934878-10×10×8 shelters which were arranged to be produced by the Claimant and were all sold to the Respondent. Therefore, it is not well established that the Claimant has breached the Distribution Agreement, or has violated the Respondent's right to exclusively distribute the Product all over the world.

6 Whether the Respondent has performed the obligations agreed in Clause 1.4.1-1.4.6 of the Distribution Agreement; Whether the Claimant has violated the Respondent's right in Clause 1.4 of the Distribution Agreement and in breach of the agreement in the Distribution Agreement.

1) Whether the Respondent has performed the obligations agreed in Clause 1.4.1-1.4.6 of the Distribution Agreement
It is agreed in Clause 1.4.1-1.4.6 of the Distribution Agreement: Brands the product, sets up customer service for the product sold in USA, Canada and/or other countries, new products or improve

or upgrade old products, for example upgraded shelter product line, changes labeling or packaging, new customers or divisions or new buyer of a current customer, review and redesign the products the suppliers in infringing. The evidence provided by the Respondent proves that the Respondent has performed part of the obligations above, involving shelters of 37-1398, 37-1107, 37-1112 and 10×20.

2) Whether the Claimant has violated the Respondent's right in Clause 1.4 of the Distribution Agreement and in breach of the agreement in the Distribution Agreement

It is agreed in Clause 1.4 of the Distribution Agreement, When the Distributor makes certain change to the supplier's organization, new orders from new customers will go through the Distributor. New orders from old customers buying divisions will go through suppliers but the profit will be split. New products (sku) from new or old customers will go through the Distributor. When the situations listed below happen: the orders related shall go through the Distributor. If the Distributor has performed the obligations agreed in Clause 1.4.1-1.4.6 of the Distribution Agreement, the corresponding order must go through the Distributor. It is agreed in Clause 9.1 of the Distribution Agreement, "The term of this Agreement shall be for 20 years, commencing January 20, 2010, ending on January 20, 2030, and automatically continuing thereafter for successive one year terms, unless either party gives a notice of cancellation to the other at least 60 days in advance of the anniversary renewal date, or sooner terminated as a result of a material breach by either party." As mentioned above, the Respondent has already performed some obligations agreed in Clause 1.4.1-1.4.6 of the Distribution Agreement, involving shelters of 37-1398, 37-1107, 37-1112 and 10×20. Hence, from January 20, 2010, the orders involving shelters of 37-1398, 37-1107, 37-1112 and 10×20 must go through the Respondent.

According to the written material *The Information of Export Customs Declaration Form, Trading Countries, Quantities and Amounts, etc. of Mobile Shelters (HS code: 94060000) and Canopies (HS code: 63062200) Exported between January 20, 2010 and July 31, 2015 by Rizhao J&J Manufacturing Co., Ltd.*, the amount of mobile shelters and synthetic fibre canopies exported by the Claimant to U.S., Canada, Finland, Sweden, Norway, Panama, Australia, Denmark, Japan, Russia, etc. from January 20, 2010 to July 31, 2015 is USD38501508.00. The Export Customs Declaration Forms of the People's Republic of China provided by the Claimant corresponding to the written evidence of Qingdao Customs prove that the mobile shelters and

synthetic fibre canopies include the mobile shelters of 37-1398, 37-1107, 37-1112 and 10×20. In the mean time, the Claimant has not provided any evidence to prove that the Claimant had paid profit to the Respondent after selling the mobile shelters above. Hence, the Tribunal holds that the Claimant has violated the agreement in the Distribution Agreement and has infringed the right of the Respondent under Clause 1.4 of the Distribution Agreement.

7 Whether the arbitration claims filed by the Claimant should be supported or not

1) The Claimant's arbitration claim to require the Respondent to pay USD1275006.52 for the goods

As mentioned above, the Respondent has received 28 shipments of goods claimed by the Claimant and the price of which is USD1278496.82; In the mean time, there is no factual or legal basis for the Respondent to refuse to pay the goods with the excuse that there is serious quality problem in the goods sold by the Claimant which caused huge economic loss to the Respondent. It is stipulated in Article 109 of the Contract Law of the People's Republic of China, "If a party fails to pay the price or remuneration, the other party may require payment thereof." Hence, the Tribunal holds that the Respondent should pay USD1275006.52 to the Claimant.

2) The Claimant's arbitration claim to require the Respondent to pay the interest for outstanding payment

It is stipulated in paragraph 4 of Article 24 of the Explanations of the Supreme People's Court on Application of Law in Trial of Disputes in Sales Contract, "If there is no agreement on liquidated damages for outstanding payment or calculation method of the liquidated damages, while the seller claims for compensation of delayed payment due to breach of the buyer, the people's court can use the benchmark rate of RMB loan of People's Bank of China in the same period and the same category as the base, with reference of the interest rate of delaying payment." Obviously, the Claimant's claimed standard of benchmark loan rate of People's Bank of China in the same period is lower than that of the standard of delaying payment stipulated in the judicial explanation in China, and the Tribunal supports it. As for the starting date of calculation of interest, since the first email provided by the Claimant requiring the Respondent to pay the delaying payment is dated on December 23, 2013, the Tribunal holds that the date shall be regarded as the starting date to calculate the interest of delaying payment. In summary, the Respondent should pay the interest of delayed payment with the delayed payment of USD1275006.52 as the principle [Pay in

RMB at the intermediate rate of inter-bank foreign exchange market declared by the China Foreign Exchange Trading Center authorized by People's Bank of China at the date (December 23, 2013) of payment], on the basis of the loan rate of the People's Bank of China in the same period, calculating from the date of December 23, 2013 to the actual date of payment, to the Claimant.

3) The Claimant's arbitration claim to require the Respondent to pay the attorney fee and travel expenses relatimg to this case

The Tribunal holds that, according to the Distribution Agreement, only the attorney fee undertaken by the Distributor due to the dispute of product quality and defect related with the products produced by the Claimant shall be compensated by the Supplier while undertaking of the attorney fee and other expenses caused by goods payment dispute are silence in the Agreement. Hence, this arbitration claim shall be not supported by the Tribunal.

8 Whether the arbitration counterclaims filed by the Respondent should be supported or not

1) The Respondent's arbitration counterclaim to require the Claimant to pay the sales profit of USD1015850.95

The Respondent states, according to Clause 1.4 of the Distribution Agreement, when the Distributor makes certain change to the supplier's organization, new orders from new customers will go through the Respondent while new orders from the buying divisions of the old customers will go through the Claimant but the profit will be equally split, therefore, the Claimant should pay the sales profit of USD1015850.95 to the Respondent. As stated before, the Respondent has already performed some obligations as per agreed in Clause 1.4.1-1.4.6 of the Distribution Agreement, involving shelters of 37-1398, 37-1107, 37-1112 and 10×20. Hence, from January 20, 2010, the orders involving shelters of 37-1398, 37-1107, 37-1112 and 10×20 must go through the Respondent; The Claimant has violated the Distribution Agreement and has infringed the right of the Respondent in Clause 1.4 of the Distribution Agreement; According to the written material, i.e. *The Information of Export Customs Declaration Form, Trading Countries, Quantities and Amounts, etc. of Mobile Shelters (HS code: 94060000) and Canopies (HS code: 63062200) Exported between January 20, 2010 and July 31, 2015 by Rizhao J&J Manufacturing Co., Ltd.*, the mobile shelters include mobile houses for animals of USD2751228.72 and mobile shelters of types other than 37-1398, 37-1107, 37-1112 and 10×20 of USD4010070.28 as well as mobile shelters without any model of USD14430207.20. The total value of USD21191506.20 mobile houses for animals,

mobile shelters of types other than 37-1398, 37-1107, 37-1112 and 10×20 as well as mobile shelters of without any model do not belong to the products that must go through the Respondent, as agreed in Clause 1.4 of the Distribution Agreement. Hence, the Tribunal holds that, as stated in the written evidence from Qingdao Customs service, the mobile shelters and synthetic fibre canopies exported by the Claimant to U.S., Canada, Finland, Sweden, Norway, Panama, Australia, Denmark, Japan, Russia, etc. from January 20, 2010 to July 31, 2015 is USD38501508.00, among which the goods must go through the Respondent as agreed in Clause 1.4 of the Distribution Agreement worth USD17310001.80. The email evidence dated on October 27, 2010 provided by the Respondent proves that the Claimant stated that the price offer for the four types of products planned to be provided to CTC includes the 8% of the sales amount belonging to the Respondent. According to the agreement in Clause 1.4 of the Distribution Agreement, when the Respondent makes certain change to the Claimant's organization, new orders from new customers will go through the Respondent while new orders from buying divisions of the old customers will go through the Claimant but the profit will be split. Both the Claimant and the Respondent confirm that the Respondent has not made any change to the organization of the Claimant; In the mean time, both the parties have not agreed on the proportion of distribution of profit. Moreover, according to the audit report and taxation statement as well as the profit & loss statement provided by the Claimant, the net profit of the Claimant during 2011-2014 is in deficit. It is agreed in the Addendum A that, if the annual sales is less than USD10,000, 000.00, the supplier will have 8% profits before taxes; if the annual sales is between USD10,000,000.00 to 20,000,000, the supplier will have 6% profits before taxes; if the annual sales is more than USD20,000,000.00, the supplier will have 5% profits before taxes. In 2011, 2012 and 2013, the value of goods sold by the Claimant through the Respondent is USD19854096.90, USD1692682.30 and USD1286758.50 respectively, in sum USD4964847.70, but the Respondent has not paid the profit before taxes to the Claimant according to the Distribution Agreement. In the mean time, the evidence provided by the Respondent proves that the Respondent has only performed part of its obligations agreed in Clause 1.4.1-1.4.6 of the Distribution Agreement. Comprehensively considering the factors above, the Tribunal holds that, the Respondent claims to distribute the sales profit of 6% for the mobile shelters and canopies sold by the Claimant separately, however, it is fair for each party to have the Respondent share 3% of the value of the

goods for the goods of USD17310001.80 sold by the Claimant separately between January 20, 2010 and July 31, 2015 under the order which must go through the Respondent as agreed in Article 1.4 of the Distribution Agreement. Therefore, the Claimant should pay sales profit of USD519300.05 to the Respondent.

2) The Respondent's arbitration counterclaim to require the Claimant to pay the liquidated damages of USD1000000.00
The Respondent stated that the Claimant has seriously violated the Distribution Agreement by selling large quantity of products to U.S. and North America without going through the Respondent, especially from 2013. According to Clause 10 of the Distribution Agreement, the Claimant should pay the Respondent the liquidated damages of USD1000000.00. It is agreed in Article 10 of the Distribution Agreement saying that "Supplier will pay to Distributor one million US dollars (USD1,000,000.00), as liquidated damages for breach of Clause 3, Clause 4, Clause 5, Clause 6, Clause 7, Clause 8 and Clause 9.2 of this Agreement by Supplier." As stated above, according to the Distribution Agreement, the Respondent shall have the exclusive right to distribute only the product produced by the Claimant as per the specifications required by the Respondent all over the world. The evidence provided by the Respondent is not sufficient to prove that the Claimant has violated the Distribution Agreement or infringed the exclusive right to distribute the product all over the world. Hence, this arbitration counterclaim shall not be supported by the Tribunal.

3) The Respondent's arbitration claim to require the Claimant to pay the attorney fee and travel expenses relating to conducting this case
The Tribunal holds that, according to the Distribution Agreement, only the attorney fee due to the dispute of product quality and defect related with the products shall be compensated by the Supplier while undertaking of the attorney fee and other expenses caused by goods payment dispute are silence in the Agreement. Hence, this arbitration counterclaim of the Respondent shall be not supported by the Tribunal.

9 Allocation of arbitration cost

According to the *Arbitration Rules*, the respective arbitration fee for the claim and counterclaim of this Case shall be allocated between the parties based on the proportion it wins or loses.

VI Award

1 The Respondent shall pay USD1275006.52 to the Claimant for the amount of the goods.

2 The Respondent shall pay interest to the Claimant for the outstanding payment of USD1275006.52 (Converted into RMB7798067.38 yuan at the

intermediate rate of inter-bank foreign exchange market declared by the China Foreign Exchange Trading Center authorized by People's Bank of China at the date of due payment), calculating from the date of December 23, 2013 to the date of actual payment (termporarily calculated as RMB 2286891.57 *yuan* at the date of issuance of this Award).

3 The Claimant shall pay USD519300.05 as the sales profit to the Respondent.

4 Reject the Claimant's any other arbitration claims.

5 Reject the Respondent's any other arbitration counterclaims.

6 The arbitration fee for the claim cost of the Case is RMB63892.00 *yuan*, which shall be undertaken by the Respondent. Since the Claimant has paid all the arbitration fee above, the Respondent shall pay its arbitration fee directly to the Claimant. The arbitration fee for the counterclaim cost of the Case is RMB87389.00 *yuan*, among which the Claimant shall undertake RMB22512.00 *yuan*, and the Respondent shall undertake RMB64877.00 *yuan*. Since the Respondent has paid all the arbitration fee, the Claimant shall pay its ratio of arbitration fee directly to the Claimant.

In summary, the Respondent should pay the Claimant RMB2328271.57 *yuan*, USD755706.47 within 10 days after receipt of this Award, and otherwise, should pay interest at the double rate for any outstanding payment if which is delayed.

The Award is final and shall come into force on the date it is rendered.


Presiding Arbitrator:

Arbitrator:

Arbitrator:

Date: 31 May, 2019

Case Manager: Liu Shuhan

74